# EXHIBIT 1

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3   MARK A. HANSEN,                    )
 4             Plaintiff,               )
 5   VS.                                )  CIVIL ACTION NO. H-05-3437
 6   AON RISK SERVICES OF TEXAS,        )
 7   INC.,                              )
 8             Defendant.               )
 9   ***********************************************************
10           ORAL AND VIDEOTAPED DEPOSITION OF
11                    MARK A. HANSEN
12
13                    MAY 10, 2006
14   ***********************************************************
15       ORAL AND VIDEOTAPED DEPOSITION OF MARK A. HANSEN,
16   produced as a witness at the instance of the Defendant, and
17   duly sworn, was taken in the above-styled and numbered cause
18   on May 10, 2006, from 10:58 a.m. to 5:00 p.m., before Robin
19   Potts, CSR in and for the State of Texas, reported by
20   machine shorthand, at the Law Office of G. Scott Fiddler,
21   P.C., 13831 Northwest Freeway, Suite 510, Houston, Texas,
22   pursuant to the Federal Rules of Civil Procedure and the
23   provisions stated on the record or attached hereto.
24
25
```

NMA
Compressed
Transcript

Page 2

```
 1              APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4      Mr. G. Scott Fiddler
 5      Law Office of G. Scott Fiddler, P.C.
 6      13831 Northwest Freeway, Suite 510
 7      Houston, TX  77040
 8
 9    FOR THE DEFENDANT:
10      Mr. Kerry E. Notestine
11      Mr. Nitin Sud
12      Littler Mendelson
13      1301 McKinney Street, Suite 1900
14      Houston, TX  77010
15
16    ALSO PRESENT:
17      Willie Grimble, Videographer
18      Victoria Ryan McDonough
19      Charles Lusk
20
21
22
23
24
25
```

Page 3

```
 1               INDEX
 2
 3  Appearances ............................   2
 4  Stipulations ...........................   6
 5  MARK A. HANSEN
 6    Examination by Mr. Notestine ...........   7
 7    Examination by Mr. Fiddler ............ 240
 8  Signature and Changes ................. 241
 9  Reporter's Certificate ............... 243
10
11
12                EXHIBITS
13  NO.          DESCRIPTION          PAGE
14  1 - Notice of Deposition and Request for Production   6
15     of Documents (6 pages)
16  2 - Resume of Mark Hansen (2 pages)         41
17  3 - Resume of Mark Hansen (2 pages)         44
18  4 - Equal Employment Opportunity from Employee    65
19     Handbook dated 8-01-04 (4 pages)
20  5 - AON Position Description, Placement Service   82
21     Unit, dated 11-29-04 (2 pages)
22  6 - E-mail from Mark Hansen dated 2-28-03; e-mail   94
23     from Bill Burke dated 2-23-03 (1 page)
24  7 - E-mail from Amanda Freeman dated 3-11-03    102
25     (1 page)
```

Page 4

```
 1               EXHIBITS
 2  NO.          DESCRIPTION          PAGE
 3  8 - E-mail from Victoria McDonough dated 4-1-03;   106
 4     e-mail from Mark Hansen dated 4-1-03; e-mail
 5     from Victoria McDonough dated 4-1-03; e-mail
 6     from Mark Hansen dated 3-24-03; e-mail from
 7     Joe Propati dated 3-24-03; e-mail from Elliott
 8     Jones dated 3-22-03; e-mail from Jack Tieman
 9     dated 3-20-03 (5 pages)
10  9 - E-mail from David Barnes dated 4-24-03; e-mail  111
11     from Victoria McDonough dated 4-24-03 (1 page)
12  10 - E-mail from Victoria McDonough dated 5-6-03   123
13     (1 page)
14  11 - E-mail from Victoria McDonough dated 5-16-03;  135
15     e-mail from Bill Burke dated 5-15-03 (1 page)
16  12 - E-mail from Victoria McDonough dated 5-29-03   138
17     (1 page)
18  13 - AON Position Description, Assistant Director -  141
19     Client Service Unit, dated 11-29-04 (2 pages)
20  14 - Performance Evaluation Form dated 8-7-03    149
21     (1 page)
22  15 - E-mail from Donna Parsley dated 10-30-03    153
23     (1 page)
24  16 - Intake Questionnaire (4 pages)         175
25  17 - Charge of Discrimination (1 page)       186
```

Page 5

```
 1               EXHIBITS
 2  NO.          DESCRIPTION          PAGE
 3  18 - Letter dated 4-12-05 to Mark Hansen from Texas  189
 4     Workforce Commission (2 pages)
 5  19 - Letter dated 4-20-05 to Texas Workforce     190
 6     Commission from Mark Hansen (6 pages)
 7  20 - Employment Discrimination Complaint (4 pages)  198
 8  21 - First Amended Complaint with attachments    202
 9     (13 pages)
10  22 - Plaintiff's Initial Disclosures with attached  211
11     Persons With Knowledge of Facts (8 pages)
12  23 - Aon Employment Timeline (10 pages)       218
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  A.  University of Hartford.
2  Q.  Did you graduate?
3  A.  Yes.
4  Q.  What year did you graduate?
5  A.  1992.
6  Q.  And what was your degree in?
7  A.  It was a Bachelor of Arts in politics and
8  government.
9  Q.  Have you ever attended graduate or professional
10 school?
11 A.  Yes.
12 Q.  What graduate or professional schools did you
13 attend?
14 A.  Long Island University in Brookville, New York.
15 Q.  What degree did you seek from there, and did you
16 graduate?
17 A.  Master of Public Administration, and I graduated.
18 Q.  What year?
19 A.  I don't recall.
20 Q.  Did you go directly from college to graduate
21 school or did you work in between?
22 A.  I went directly from college to graduate school.
23 Q.  Any other education, formal education or, you
24 know, informal?  Sometimes people attend training programs
25 or classes to get licenses in certain things, things like

1  that.
2  A.  Yes.  I have my adjustor's license, Texas
3  adjustor's license, and a Texas insurance agent general
4  lines license.
5  Q.  Did you attend schools to get those licenses or
6  classes or something?
7  A.  I guess you could say "yes."
8  Q.  Who did those schools?
9  A.  I don't recall.
10 Q.  Like, at the community college or something like
11 that?
12 A.  No.  It would have been -- for the general lines
13 license, I studied on my own.  So, I did not attend class
14 for that.  For the adjustor's license, I don't recall
15 whether I did or I didn't.  I don't know.
16 Q.  Do you have any other special training or licenses
17 other than what we've talked about here?
18 A.  I do not.
19 Q.  Sometimes people have real estate degrees, for
20 example, or, you know, they are a certified, you know,
21 handgun expert.  You get all kinds of things.  Nothing like
22 that?
23 A.  No, no.
24 Q.  Do you have -- you mentioned two licenses.  Do you
25 have any designations that go with those licenses?

1  A.  I do not.
2  Q.  Did you ever serve in the military?
3  A.  No.
4  Q.  From the time you graduated from college to the
5  present, can you tell me what companies you've worked for?
6  We'll start the first place that you held employment.
7  A.  From the time I graduated college?
8  Q.  Yeah, let's start with graduating college.  If you
9  just worked in summer jobs during school or worked during
10 school, I'd like to know that.
11 A.  Okay.
12 Q.  From the time you graduated from college.  I don't
13 need to know that you worked at Burger King in the summer or
14 something like that, not that you did.
15 A.  Well, I'll tell you I'm not sure what the timeline
16 is; but I worked for a company called Developmental
17 Disabilities Institute in Smithtown, New York.
18 Q.  And what did you do for them?
19 A.  I was a counselor for mentally retarded or
20 handicapped adults.
21 Q.  Okay.  And how long did you do that job?
22 A.  I don't recall.
23 Q.  Was this while you were in school or after school?
24 A.  Probably both.
25 Q.  In undergraduate and/or MPA?  What's MPA school?

1  What is that?
2  A.  Master's of Public Administration.
3  Q.  Graduate school I'll call it.  Was that while you
4  were in graduate school as well?
5  A.  It could be.
6  Q.  And why did you leave that job?
7  A.  I got another job.
8  Q.  What was the next job you had?
9  A.  I worked for Fireman's Fund Insurance Company.
10 Q.  What did you do for Fireman's Fund?
11 A.  I was a workers' compensation claims adjustor.
12 Q.  Were you still in school at the time?
13 A.  No.
14 Q.  This was a full-time job after you graduated from
15 graduate school?
16 A.  Yes.
17 Q.  I think I understand what a workers' comp claim
18 adjustor is, but could you just briefly describe what that
19 is?
20 A.  I adjusted workers' compensation claims for
21 medical and lost time benefits.
22 Q.  Where was this?
23 A.  It's in Melville, New York.
24 Q.  How long did you do that job?
25 A.  Approximately a year.

Page 38

1  Q.  And why did you leave that job?
2  A.  I was offered another position.
3  Q.  With whom?
4  A.  Federated Department Stores.
5  Q.  What did you do for Federated Department Stores?
6  A.  I handled workers' compensation claims.
7  Q.  And do you know about when you took that job?
8  A.  Approximately April of 1995.
9  Q.  So, you would have started about April of '94 with
10 Fireman's, something like that?
11 A.  Possibly.
12 Q.  How long did you work for Federated?
13 A.  For one year.
14 Q.  Did the same thing the whole time?
15 A.  Yes.
16 Q.  Why did you leave that job?
17 A.  Because I was offered another position.
18 Q.  With whom?
19 A.  With Fireman's Fund Insurance Company.
20 Q.  You went back to Fireman's Fund?
21 A.  Yes.
22 Q.  And where was that job?
23 A.  In Boston, Massachusetts.
24 Q.  Is that where you worked for Fireman's Fund
25 before?

Page 39

1  A.  No.
2  Q.  And what did you do for Fireman's Fund the second
3  time?
4  A.  I was a client services manager.
5  Q.  Tell me what you do in that position.
6  A.  I was responsible for making sure that the
7  insureds were happy with Fireman's Fund's claims,
8  underwriting, and loss control services.
9  Q.  How long did you do that job?
10 A.  Until May of 2001.
11 Q.  So, from April or May of '95 to April or May --
12 A.  '96.
13 Q.  '96.  I'm sorry.  So, approximately five years?
14 A.  Uh-huh.
15 Q.  Is that right?
16 A.  That's correct.
17 Q.  Why did you leave that job?
18 A.  Because I was offered another position.
19 Q.  What position were you offered?
20 A.  The director of technical operations for Aon.
21 Q.  Where was that job?
22 A.  In Houston.
23 Q.  And who offered that job to you?
24 A.  John Gabel.
25 Q.  How did you find out about that job?

Page 40

1  A.  He called me.
2  Q.  How did he call you?
3  A.  On the telephone.
4  Q.  How did he know to call you?  I mean, did he just
5  call you out of the blue?  Did you know the guy?
6  A.  He was my former boss.
7  Q.  Former boss where?
8  A.  At Fireman's Fund.
9  Q.  In Boston?
10 A.  Yes.
11 Q.  Were you looking for work at the time or did he
12 just call you?
13 A.  He just called me.
14 Q.  We're going to skip over Aon right now, and we're
15 going to talk a little bit about what happened subsequent to
16 Aon.  Okay?  And when -- let me guess a question first.
17 Mr. Gabel, when he called you -- it's Gabel; is that right?
18 A.  That's correct.
19 Q.  He was working where at the time?
20 A.  At Aon in New York.
21 Q.  What city?
22 A.  New York.
23 Q.  And he indicated that there was a job available in
24 Houston?
25 A.  Yes.

Page 41

1  Q.  Okay.  Let's -- let's skip over.  You never worked
2  for Aon at any place but Houston; is that right?
3  A.  Yes, that's correct.
4  Q.  Okay.  When you left Aon -- well, actually, let me
5  go through this first.
6      (Exhibit No. 2 was marked)
7  Q.  I'm handing you what's been marked as Defendant's
8  Exhibit 2.  Can you identify that document, please?
9  A.  This is -- appears to be a copy of the resume I
10 presented to.
11 Q.  That was actually my question.  Is this a resume
12 that you presented to whom?
13 A.  This was a resume I had prepared for myself.
14 Q.  So, you -- it looks like you were already working
15 at Aon.  So, it wasn't something like -- that you would
16 present to Aon looking for a job; right?  I mean --
17 A.  Right.
18 Q.  -- it obviously happened after?
19 A.  Correct.
20 Q.  Do you know why you put this together?  Were you
21 looking for another job at the time or --
22 A.  Well, when I was demoted.
23 Q.  So, you would have, then, prepared this around the
24 time you got demoted, you think?
25 A.  Uh-huh.  It would have been before my formal

Page 54

1   Q.   Do you take any sort of salary from the company?
2   A.   I have not.
3   Q.   Did you have any customers when you started that
4   business or have you developed all of them since you started
5   the business?
6   A.   All developed since I started the business.
7   Q.   And how have you generated customers with the
8   business?
9   A.   Advertising.
10   Q.   What do you advertise?  How do you advertise?
11   A.   Yellow Pages, Internet.
12   Q.   From the time you left Aon in December of 2003 to
13   the present, have there been any times where you were
14   physically or mentally unable to work?
15   A.   After I left?
16   Q.   Yeah.
17   A.   Yes.
18   Q.   When were you physically or mentally unable to
19   work?
20   A.   I was always -- let me rephrase my answer.  I'd
21   say I was always able to work.
22   Q.   Okay.  Okay.  Was there a physical or mental
23   problem that limited your ability to work?
24   A.   Lots of stress, headaches, stomach upset,
25   depression --

Page 55

1   Q.   But you --
2   A.   -- anxiety about income.
3   Q.   But you never saw a doctor or a mental health
4   professional about any of those problems?
5   A.   No.
6   Q.   That's correct, you didn't?
7   A.   I did not see a medical professional about those
8   problems.
9   Q.   Did you ever take any medication or anything?
10   A.   No.
11   Q.   Ever receive counseling of any sort?
12   A.   No.
13   Q.   Who would know about --
14   A.   Medication, can you clarify "medication"?  Like,
15   Pepto Bismol?
16   Q.   I guess Pepto Bismol would be medication.
17   A.   Then yes.
18   Q.   Anything besides Pepto Bismol?
19   A.   Tums.
20   Q.   Anything besides Pepto Bismol and Tums?
21   A.   Any other over-the-counter remedy.
22   Q.   No prescription remedies?
23   A.   No.
24   Q.   Did that -- did this -- did these symptoms that
25   you've mentioned here limit your ability to generate income

Page 56

1   in any way from your franchise business?  Can you not go to
2   work because of these symptoms?
3   A.   No.  I have a bathroom at the office.
4   Q.   I'm sorry?
5   A.   I have a bathroom at the office.
6   Q.   Okay.  So -- so, you would have to stay in your
7   bathroom for some period of time?
8   A.   So, if I had an upset stomach, I'd have to use the
9   bathroom.  And I would have to lock the door because I was
10   the only one present at the time.
11   Q.   Okay.  Any other restrictions on your ability to
12   earn income after your termination from Aon?
13   A.   Not that I'm aware of.
14   Q.   Did you have any other problems because of your
15   termination from Aon other than these physical symptoms that
16   we've mentioned already?
17   A.   Specifically ...
18   Q.   Any socially?  Have you been divorced because of
19   your termination from Aon?
20   A.   No.
21   Q.   Have you lost your house because of your
22   termination from Aon?
23   A.   No.
24   Q.   Have you lost your car because of your termination
25   from Aon?

Page 57

1   A.   No.
2   Q.   Anything like that?  I don't want to limit it to
3   that.  I mean, I want to know what you think you suffered as
4   a result of your -- of your termination from Aon.
5   A.   Well, specifically to the items you mentioned, the
6   answer is "no."  I did not lose my house.  I did not lose my
7   car.
8   Q.   Any -- but I want to know what you think you
9   suffered as a result of your loss of employment.  I just
10   gave you some examples of things that have said -- people
11   have said in other cases.  But did you suffer anything else
12   because of your loss of employment?
13   A.   I've suffered loss of monetary income, savings.
14   Q.   And you've produced a document that sort of
15   describes that; right?
16   A.   I believe so.
17   Q.   Anything else besides that?
18   A.   I'm not aware of any at the time.  I don't know.
19       MR. NOTESTINE:  Why don't we take a
20   five-minute break.  Okay?  It's a stopping point.
21       THE VIDEOGRAPHER:  Going off the record.
22   The time is 11:51 a.m.
23       (Recess taken)
24       THE VIDEOGRAPHER:  We are back on the
25   record.  The time is 12:04 p.m.

Page 58

1    Q.   (BY MR. NOTESTINE)  Okay.  We've talked,
2  Mr. Hansen, about your work before you went to Aon and what
3  you've done subsequent.  What I want to do now is start and
4  go through your employment at Aon.  Could you tell us when
5  you first started working for Aon?
6    A.   May 2001.
7    Q.   And tell me the process you went through to get
8  the job.  I know you've mentioned briefly already what it
9  was, but kind of give me sort of the details you went
10  through to get the job.
11    A.   John Gabel called me.  I applied for the position,
12  interviewed for the position, and received the position.
13    Q.   Mr. Gabel had formerly worked with you at
14  Fireman's Fund; is that right?
15    A.   That's correct.
16    Q.   And then he apparently had moved and became an
17  executive with Aon; right?
18    A.   Yes.
19    Q.   And what was his position at the time?
20    A.   I believe he was a managing director.
21    Q.   Did he have some supervisory authority over what
22  was going on in Houston?
23    A.   Yes, my position specifically.
24    Q.   So, at the time of your hire, you reported
25  directly to Mr. Gabel?

Page 59

1    A.   Yes.
2    Q.   Can you tell us about the Houston office, what --
3  what sort of work was going on there, who was working there?
4  I mean, not every name of every person; but can you tell me
5  what the operation of the Houston office was like?
6    A.   They were reorganizing into a service center for
7  the south region.
8    Q.   What do you mean by a service center?  The jury is
9  probably not familiar with the insurance brokerage business.
10  So, could you tell us what kind of service they would be
11  providing that they needed a center?
12    A.   Yes.  They were providing certificates, that all
13  insurance certificates would be done in one central
14  location.
15    Q.   And what is an insurance certificate?
16    A.   It's the certificate that shows a certificate
17  holder that a particular insured has coverage.
18    Q.   So, like, I'm some company, like, Acme Oil
19  Company.  And, so, I need insurance for property or casualty
20  loss, right, or something?  And, so, they -- they ask Aon to
21  what?  You tell me how it works.  So, what is their
22  certificate and why would a company need a certificate?
23    A.   Well, the certificate would show that they have
24  coverage and that the person is listed as a certificate
25  holder or an additional insured.

Page 60

1    Q.   Okay.  And, so, what was the service center doing
2  in order to facilitate that process?
3    A.   They were -- an order would come in for a
4  certificate.  They would create that certificate.  And
5  that's just one of the functions.
6    Q.   So, Aon would have brokers or salespeople working
7  with the companies directly and then -- you know,
8  determining what the insurance needs were for the company?
9    A.   Correct.
10    Q.   And then the service center would do what, would
11  do sort of all the --
12    A.   The back room.
13    Q.   -- the back room details for --
14    A.   Correct.
15    Q.   -- getting that insurance coverage that they had
16  sold for the company?
17    A.   Yes.
18    Q.   And what specifically were you doing?
19    A.   When I first started, I was the director of
20  technical operations.  So, my unit was responsible for
21  claims, loss control, and data management.
22    Q.   Okay.  Let's talk about that.  What -- what are
23  claims?
24    A.   It was actually claims advocacy.  Our group didn't
25  actually adjust claims.

Page 61

1    Q.   Now, why would somebody need to have a claims
2  advocate?
3    A.   So someone could from the brokerage side work with
4  the insurance company to ensure the claim was handled
5  appropriately and for the correct amount.
6    Q.   So, one of Aon's customers would have a loss of
7  some sort?
8    A.   Correct.
9    Q.   It may be property damage, let's say.  Or let's
10  say they have a fleet of vehicles and somebody's car gets
11  stolen.
12    A.   Yes.
13    Q.   So, then Aon would act on behalf of the insured to
14  make sure that the insurance company paid the claim; is that
15  right?
16    A.   Well, to make sure the claim was handled
17  correctly.
18    Q.   Okay.  If -- if it was a covered claim and it
19  was --
20    A.   Correct.
21    Q.   And, so, what was your group doing exactly?
22    A.   They were providing that advocacy role.
23    Q.   So, the broker would say, "Hey, you know, Acme
24  Corporation needs some assistance on this theft.  And could
25  you work with the insurance company, make sure it gets taken

Page 74

1  Q.  Okay. And what is client account services? What
2  does that mean?
3     A.  It was the unit that primarily handled the
4  submissions, created the submissions for the middle --
5  middle market business, the -- not the largest clients,
6  the -- the smaller clients that were serviced in the service
7  center.
8     Q.  Okay. So, the company sort of divided up the
9  clients by big clients and not so big clients?
10    A.  Correct.
11    Q.  Middle market was everybody that wasn't a big
12 client?
13    A.  I would guess so.
14    Q.  And you did account services. Some of the people
15 in the jury that might be listening to this or watching this
16 may not understand what that means. Could you tell us what
17 that --
18    A.  The unit was primarily charged with creating the
19 submissions that would go to insurance companies so that the
20 insurance companies could quote the insurance. And then
21 they were responsible for ordering any of the postplacement,
22 such as certificates or invoicing or anything regarding
23 postplacement for the account that they were working on.
24    Q.  And tell me how you got this position as client
25 account super -- services director, director of the client

Page 75

1  account services group. Did you interview for it? Did
2  somebody just walk in and say, "This is what you're doing
3  next"? Or how did that happen?
4     A.  I was doing special assignments. And then I
5  recall a conversation where I was asked to put together a
6  business plan to improve the client account services unit.
7  I provided the business plan. And then I was told, "Well, I
8  guess I'll give it to you."
9     Q.  Who said that?
10    A.  Vicki McDonough.
11    Q.  And what was Miss McDonough's position?
12    A.  She was a managing director of the Houston client
13 services unit, CSBU. At the time it was called that.
14    Q.  Okay. Were you reporting to her at that time?
15    A.  Yes.
16    Q.  So, tell me when you started reporting to Miss
17 McDonough.
18    A.  It would be sometime in the spring of 2002 after
19 technical operations disbanded.
20    Q.  So, you're doing special projects work originally
21 for Mr. Gabel?
22    A.  No. I would -- when I was doing special projects,
23 I reported directly to Miss McDonough.
24    Q.  Was she managing you as technical -- director of
25 technical operations for some period of time?

Page 76

1     A.  No.
2     Q.  So, that disbanded. At that time you quit
3  reporting to Mr. Gabel?
4     A.  That's correct.
5     Q.  Up to that time had you been evaluated in your
6  performance in any way by Mr. Gabel?
7     A.  Yes.
8     Q.  Tell me what the company's process was for
9  evaluating people's performance. Yearly review? Semiannual
10 review? They never did anything? Tell -- just tell me what
11 the process was.
12    A.  At that point I believe it was a yearly review.
13    Q.  And do you know what your review was from
14 Mr. Gabel?
15    A.  I don't -- I was not given a written review.
16    Q.  Okay. So, he just talked to you about it?
17    A.  Yes.
18    Q.  What did he say?
19    A.  I don't recall.
20    Q.  Okay? Not okay?
21    A.  Okay is -- is -- I would say --
22    Q.  As far as you remember, it was okay?
23    A.  Yes. Otherwise, I'm sure that some other action
24 would have been taken.
25    Q.  So, then, when the technical operations group was

Page 77

1  disbanded, then you started doing special projects working
2  for Miss McDonough?
3     A.  That's correct.
4     Q.  When did -- you had mentioned before there was no
5  level of management between you and Mr. Gabel when you
6  started. When did Miss McDonough come in? It sounds like
7  she was in a level management in Houston above you.
8     A.  She was.
9     Q.  When did that -- when did that happen?
10    A.  As soon as the tech -- technical operations
11 department was disbanded.
12    Q.  They hired Miss McDonough to run the -- or what
13 happened?
14    A.  No. I believe she was there running other
15 departments.
16    Q.  So, she became the managing director of the
17 Houston office?
18    A.  Correct.
19    Q.  Everything that was going on there?
20    A.  Of the service center.
21    Q.  And --
22    A.  I was the only department in the service center
23 that didn't report directly to a managing director in
24 Houston.
25    Q.  Okay. So, then you started reporting to a

Page 86

1  Q.   When you had the discussions with the HR people
2  about disciplining or terminating people, did the people's
3  gender ever come up?
4  A.   No.
5  Q.   Okay.  I think you were looking through this
6  document to see if this is an accurate description of the
7  job that you did while you were working in the placement
8  services unit.
9  A.   Yes.
10 Q.   It says under -- on the second page "Professional
11 Education And Experience, Advanced degree preferred."  And
12 you had an advanced degree; right?
13 A.   Yes.
14 Q.   An MPA, I think?
15 A.   Yes.
16 Q.   And it talks about some other categories of -- of
17 experiences -- of experience or criteria.  The first one is
18 "Extensive knowledge of and experience in the insurance
19 industry; must attain and maintain appropriate brokers
20 licenses."  Did you have that?
21 A.   I acquired that in July 2002.
22 Q.   A broker license?
23 A.   A general lines license.
24 Q.   Is that -- is that what we talked about before in
25 your job description, the -- all states thing that we

Page 87

1  talked about?  Is that --
2  A.   The property and casualty license, yes.
3  Q.   Okay.  And what was your experience in the
4  insurance industry up to that -- the time you became the
5  director of the placement services unit?
6  A.   Can you be more specific, please?
7  Q.   Well, this thing, it says that you need extensive
8  knowledge of and experience in the insurance industry.  I'm
9  just asking, what was your -- did you have extensive
10 knowledge of and experience in the insurance industry?
11 A.   Well, I had worked for an insurance -- in an
12 insurance capacity since 1994.  So, at that point I had
13 multiple years of insurance experience.
14 Q.   So, you're talking about the work you did at
15 Fireman's Fund those two different stints --
16 A.   Correct.
17 Q.   -- right?
18      And then you worked for Federated --
19 A.   Correct.
20 Q.   -- in a claims group; right?
21 A.   Correct.
22 Q.   That wasn't with an insurance company, was it?
23 A.   They -- they were acting as a third-party
24 administrator or TPA.
25 Q.   Okay.

Page 88

1  A.   It was self-insureds.
2  Q.   They were self-insureds.  So, you were kind of --
3  A.   Yes.
4  Q.   -- doing that?
5  A.   Yes.
6  Q.   And then you went to work for Aon after the second
7  stint at Fireman's Fund?
8  A.   That's correct.
9  Q.   "Strong knowledge of and experience in ACS
10 operations."  What is that?
11 A.   That would have been Aon client services.
12 Q.   Is that what you had done before?
13 A.   No.  Aon client services is how the -- Aon
14 internally operated the service center.
15 Q.   Had you worked in that before you became the
16 director of placement services unit?
17 A.   Yes, as the director of technical operations.
18 Q.   That's what I was asking.  That was part of the
19 ACS group; is that right?
20 A.   Correct.
21 Q.   Okay.  Some of these others are general
22 requirements.  The last thing, "Exemplifies the behaviors
23 defined in the Aon Competency Model," what is that?
24 A.   I don't know.
25 Q.   You never heard that term or it was never

Page 89

1  discussed?
2  A.   No.  I don't know what the Aon competency model
3  is.
4  Q.   Do you ever -- ever remember terminating Marye Ann
5  Tucker?
6  A.   Yes.
7  Q.   And what -- what happened in that situation?
8  A.   I was told to do it.
9  Q.   Told by who?
10 A.   By Miss McDonough.
11 Q.   Why?
12 A.   Because she didn't want her as an assistant
13 director.
14 Q.   Had -- had you experienced working with her up to
15 that point when you were told to terminate her?
16 A.   I had not.
17 Q.   She just comes in and tells you to fire her?
18 A.   Yes.
19 Q.   And you did?
20 A.   Yes.  Actually, she did it.  We both did it
21 together.
22 Q.   So, you both sat in and did it?
23 A.   Yes.
24 Q.   What -- did she say at the termination why she was
25 terminating her?  Poor performance?  "Sorry, we're letting

Page 90

1 you go"?
2    A.   I don't recall at this point.
3    Q.   Did you discuss her gender at all with Miss
4 McDonough when you were discussing her --
5    A.   Her gender was not discussed, no.
6    Q.   Who's John Canter?
7    A.   John Canter was the director of client account
8 services prior to my taking that position.
9    Q.   And what happened to him?
10    A.   He was terminated from the position.
11    Q.   Do you know why?
12    A.   I do not.
13    Q.   Were you involved in the decision at all?
14    A.   I was not.
15    Q.   Did you have any discussions with Miss McDonough
16 in any way?
17    A.   I did not.
18    Q.   Do you have any reason to believe he was
19 discriminated against based on his gender?
20    A.   I don't know.
21    Q.   Tell me some of the things you had to do in this
22 job.  Did you ever have to travel, for example?
23    A.   Yes.
24    Q.   Why would you have to travel?
25    A.   To visit some of the offices that we supported.

Page 91

1    Q.   And why would it be necessary to visit those
2 offices?
3    A.   See if they were familiar with the people that
4 were working on their accounts.
5    Q.   And would you go by yourself or would you go with
6 other people or how would that typically work?
7    A.   Usually we would go with other people.
8    Q.   And when you were there, you would just kind of
9 walk around and say hi to people or would there be
10 presentations or were there --
11    A.   Typically there would be a presentation.  It would
12 be an announced visit.
13    Q.   And did you usually give these presentations or
14 how did that work?
15    A.   I don't recall.  It could have been a combination
16 of folks.  I do recall one -- one presentation that I made
17 to the Miami office regarding how the new business unit
18 worked.
19    Q.   How many different offices did your group support?
20    A.   Multiple offices.
21    Q.   Was there certain states that your group
22 supported?
23    A.   Yes.
24    Q.   What states?
25    A.   We supported Virginia to Florida, Tennessee,

Page 92

1 across to Oklahoma and down to Texas.
2    Q.   So, the southeastern part of the United States?
3    A.   Yes.
4    Q.   And all the offices that might be in any of those
5 places?
6    A.   Yes.
7    Q.   I haven't really asked this, but could you just
8 for the jury just give a short description of what the
9 business of Aon is?  What do they do?
10    A.   They work with customers to find insurance
11 companies that will write insurance for their business and
12 then they procure that insurance and then they -- they
13 manage that process and make sure their insurance program is
14 correctly handled.  And they have other divisions that I'm
15 not -- I don't have the specifics on them.
16    Q.   Okay.  And, so, the -- and the region that you
17 worked in, that was just one part.  And you did the same
18 thing basically as Aon generally did; right?  There were
19 brokers there and the brokers did what you said and then
20 they had back office people that sort of executed all the
21 work and that kind of stuff; right?
22    A.   Yes.
23    Q.   Do you remember ever having a presentation you
24 were supposed to be doing in Dallas and you not -- did not
25 do it?

Page 93

1    A.   No.  I remember a presentation in North Carolina.
2    Q.   Okay.  Tell me about that situation.
3    A.   That was a presentation that Miss McDonough and I
4 were going to do together; and, unfortunately, I was not
5 able to make that.
6    Q.   Okay.  What -- what happened that you weren't able
7 to make that?
8    A.   I didn't get to the plane before they closed the
9 door.
10    Q.   So, was that a problem?
11    A.   She said it wasn't.  She said, "Don't worry about
12 it.  Go back to the office."
13    Q.   Did you ever have any other problems making
14 presentations you were supposed to make in any other place?
15    A.   I don't recall.
16    Q.   While you were the director of the PSU, do you
17 remember who worked for you specifically as ADs, assistant
18 directors?
19    A.   Yes, I do.
20    Q.   And who were they?
21    A.   It was Janice Stephens and Rachel Morales.
22    Q.   And did you generally have a good working
23 relationship with them?
24    A.   Yes, I did.
25    Q.   Were there any problems with their performance

Page 114

1   named -- I don't remember her specific name right now -- and
2   she was having difficulty performing the job duties. And I
3   was looking to see if there was another department that
4   would be better suited for her. She was a very nice woman.
5   And I called to ask if we could talk about that, and that's
6   when I was asked to come upstairs.
7       Q.  Before I get to that, let me -- let me -- you were
8   talking there about transferring one of your employees to
9   another department.
10      A.  Right.
11      Q.  And you've had several different jobs up to this
12  point. Was that pretty common in Aon for people to move
13  around between different departments and --
14      A.  I don't know.
15      Q.  You don't know one way or the other?
16      A.  The company was going through a large
17  reorganization. So --
18      Q.  It sounds like they had reorganizations a lot. Is
19  that right or not right?
20      A.  I don't know if you would consider it a lot or
21  not.
22      Q.  Was -- did employees have some responsibilities
23  for locating their own positions if things weren't working
24  out in a particular job they were having? Is that something
25  you could do? You could decide, "Hey, I really don't like

Page 115

1   what I'm doing. I want to go to, you know, syndication and
2   get a job there"? Is that something you could do?
3       A.  I imagine if you were interested, you could put in
4   an application.
5       Q.  And it would work the other way? If the company
6   thought that maybe a position here wasn't the right fit for
7   an employee, you could look around, see if there was other
8   positions available that they might be able to fit into? Is
9   that something that happened at Aon?
10      A.  You might say that, yes.
11      Q.  It wasn't necessarily a, "If you don't fit in
12  here, you're out the door"? You could look and find other
13  jobs? That's a pretty common situation or was that unusual
14  in Aon?
15      A.  Well, it's a large company. So, there's -- there
16  are opportunities available, whether or not you qualify for
17  them.
18      Q.  Okay. So, back to your discussion about demotion.
19  So, they called you up -- or Miss McDonough called you up to
20  talk to you after your inquiry about a subordinate employee
21  of yours; right?
22      A.  That's correct.
23      Q.  So, tell me what happened next.
24      A.  I was told that it wasn't working out and that I
25  could have three options. And one was to be demoted. One

Page 116

1   was to take a severance package. One was to find another
2   job within the company. And it was at that point I was told
3   I couldn't have the director of document production position
4   because it required a lot of insurance experience and Donna
5   had raised the bar and I wouldn't want it, she said.
6       Q.  Who's Donna?
7       A.  Donna Parsley is the woman who is the director of
8   that department at the time.
9       Q.  Okay. So, was that position available or
10  something?
11      A.  At that time?
12      Q.  Yeah. You said she -- you couldn't have the
13  director of document production while Donna was in it. Why
14  would you have it anyway?
15      A.  Because there was going to be a reorganization of
16  all the directors.
17      Q.  Okay. And, so, Donna was going to move to another
18  position; and you understood that?
19      A.  At that time I didn't know that. The statement
20  was, "You can't have the position because it requires a lot
21  of insurance experience, and Donna has raised the bar."
22      Q.  What does it mean by raising the bar?
23      A.  I don't know. I'm just stating verbatim what was
24  told to me.
25      Q.  Did that mean anything to you?

Page 117

1       A.  I wouldn't assume anything.
2       Q.  So, you don't know what that means one way or the
3   other?
4       A.  I'm not going to assume because it wasn't my
5   words.
6       Q.  Okay. Did Miss Mc -- by the way, was it only
7   between you and Miss McDonough or was anybody else there?
8       A.  No, no one else was present.
9       Q.  Did Miss McDonough say why she was giving you
10  these three options?
11      A.  She told me that my turnover was high, but yet she
12  provided no statistics to prove that compared to any of the
13  other departments.
14      Q.  Well, you've just talked about the fact that your
15  turnover was high. But your position is that other groups
16  had similar high turnover?
17      A.  The country as a whole.
18      Q.  The con --
19      A.  All four Aon client service centers had turnover.
20      Q.  Were you aware of what specifically the turnover
21  was in the other departments?
22      A.  I was not.
23      Q.  At this time who were your peers in the company in
24  terms of gen -- in terms of gender? What -- how many people
25  were there and what were their genders?

30 (Pages 114 to 117)

Page 118

1   A.   Specifically in the Houston center?
2   Q.   Well, who -- you said she said that the turnover
3   was high, but she didn't give any -- I don't remember
4   exactly what your words were, but that it was high in other
5   groups too and they weren't -- nothing was happening to
6   them or something to that effect is what I took from what
7   you said. So, I'm asking, what were the other groups and
8   what -- what were the genders of the directors of those
9   other groups?
10  A.   Well, directly within the Aon -- the Houston
11  center, you'd have policy maintenance run by Sharon Patin.
12  You'd have client services unit run by Dan Yelich. You'd
13  have document production run by Donna Parsley. You'd have
14  operations support services run by Kimberley Overgoner. And
15  I believe that may be it.
16  Q.   Okay. Those were the groups at the time of your
17  demotion?
18  A.   I believe so, if I recall correctly.
19  Q.   And Miss McDonough supervised all those people?
20  A.   Yes.
21  Q.   And can you tell us what your performance was
22  compared to those other people, to your knowledge?
23  A.   I don't know what the other people's performance
24  was.
25  Q.   Do you know what their turnover was, which is --

Page 119

1   A.   I do not.
2   Q.   Did Miss McDonough say anything about why she was
3   offering you three options instead of just demoting you?
4   A.   No.
5   Q.   Do you have any thoughts about that?
6   A.   No.
7   Q.   Did you feel that it was inappropriate for her to
8   offer you three options? I think you said demotion,
9   outplacement, or intracompany transfer. Was that
10  inappropriate in any way?
11  A.   No, that's correct.
12  Q.   That's a correct statement, but is -- is -- was
13  her offering those three options to you inappropriate in any
14  way?
15  A.   No.
16  Q.   What was the demotion to? What position were you
17  going to be demoted to?
18  A.   To the position that I took, assistant director of
19  client services unit.
20  Q.   Did she say anything about your pay? Was it going
21  to be decreased or increased?
22  A.   No. It would remain unchanged.
23  Q.   Did you consider this to be a adverse act by Miss
24  McDonough?
25  A.   Yes. I was demoted from a director position to an

Page 120

1   assistant director position.
2   Q.   Do you believe that that was because of your
3   gender?
4   A.   Yes.
5   Q.   Why?
6   A.   Because I was male. I was replaced by a woman.
7   Q.   Who replaced you?
8   A.   Sharon Patin.
9        I was qualified to do the position. The reason
10  for termination was incorrect, false. And then other men
11  had been demoted at the same -- also or terminated.
12  Q.   What -- what other men had been demoted?
13  A.   John Canter.
14  Q.   And you talked about him before; right?
15  A.   Yes.
16  Q.   Remind me what he -- what happened to him?
17  A.   He was the director of client account services
18  before I took that position.
19  Q.   Do you know anything about his performance?
20  A.   I do not.
21  Q.   Okay. Anybody else who had been demoted? Let's
22  talk about demotion first. Then we'll talk about
23  termination next.
24  A.   Not that I can recall.
25  Q.   Had there been any females demoted?

Page 121

1   A.   Not that I can recall.
2   Q.   Now terminated. Who -- what males had been
3   terminated at this time?
4   A.   Well, you could consider John Canter was -- John
5   was terminated.
6   Q.   Was he still with the company, though?
7   A.   After his termination from the director position?
8   Q.   Yeah.
9   A.   I believe so.
10  Q.   What, he found another job within the company
11  someplace?
12  A.   I -- I believe so.
13  Q.   Sort of like the third option that Miss McDonough
14  gave you, an intracompany transfer?
15  A.   I don't know what he was offered.
16  Q.   But that was something else that was an option
17  that he could do?
18  A.   I don't know.
19  Q.   Do you know if there's any positions available for
20  you to transfer to at the time of your demotion?
21  A.   I don't recall.
22  Q.   Did you look in any way to try and find another
23  job?
24  A.   No, not within the company.
25  Q.   To your knowledge, did Miss McDonough look and see

Page 122

1  if there's any positions for you that were available?
2  **A.   Well, you could infer that from this; but I don't**
3  **know.**
4  Q.   You don't know one way or the other; is that
5  correct?
6  **A.   Yes.**
7  Q.   Do you -- do you know anybody that was -- took a
8  severance package, sort of your second option, at or around
9  this time, male or female?
10  **A.   I don't.**
11  Q.   Did she say anything about your gender when she
12  told you that she was giving you these three options?
13  **A.   No.**
14  Q.   Any other reason you believe that the -- this
15  meeting where these three options were given was because of
16  your gender?
17  **A.   I provided those specifics.**
18  Q.   What you've already said; right?
19  **A.   Correct.**
20  Q.   Nothing else?
21  **A.   Correct.**
22  Q.   I'm just -- I'll keep saying, "Nothing else,"
23  until you say, "No."
24  **A.   Okay.**
25  Q.   Did you feel at the time that you were being

Page 123

1  discriminated against based on your gender?
2  **A.   Yes.**
3  Q.   Did you file a charge on this?
4  **A.   I did not.**
5  Q.   Why not?
6  **A.   Because I didn't believe that if I reported it**
7  **within the company that it would be acted upon and it would**
8  **have a negative impact on me as I continued to try to**
9  **perform the assistant director's position.**
10  Q.   And you didn't file a charge of discrimination
11  with the EEOC or the Texas Workforce Commission either;
12  right?
13  **A.   At that time, no.**
14  Q.   And why not?
15  **A.   Because my salary level was the same.**
16  Q.   Did you talk to the EEOC or Texas Workforce
17  Commission about filing a charge at this time, just didn't
18  go forward or just didn't happen to --
19  **A.   I did not talk to them.**
20  (Exhibit No. 10 was marked)
21  Q.   I'm handing you what's been marked as Exhibit 10
22  and wonder if you've ever seen that.  Have you seen this?
23  **A.   No.  If I did see it, it would have been part of**
24  **the EEOC file; but I don't recall.**
25  Q.   This is a memo, I believe, that Miss McDonough

Page 124

1  sent to Mr. Barnes, who's in HR, about the meeting you just
2  discussed.  Okay?  Let's just kind of go over this real
3  briefly.  "I spoke with Mark yesterday."  So, it would have
4  been March 5th.  Is that about the right date?
5  **A.   Would that be May the 5th?**
6  Q.   I'm sorry.  May 5th.  You're right.  I'm sorry.
7  May 5th.
8  **A.   Yes, that's -- that sounds correct.**
9  Q.   "I advised him that his department is not working
10  effectively and that we need to make a change in management
11  to assure that we get the results we need."  Did she talk
12  about that with you?
13  **A.   No.  All I was told was turnover.**
14  Q.   Is it possible she said that, you just don't
15  remember it?  Or is it your testimony that she did not say
16  that?
17  **A.   She may have said that.  Yeah, I'll say she said**
18  **that.**
19  Q.   Okay.  Then it says "The issues are excessive
20  turnover, monitoring of the work and level of talent within
21  the department."  Do you -- was there anything said about
22  that?
23  **A.   No.  I disagree with the statement.**
24  Q.   Well, I know you disagree with the statement; but
25  did she say that to you?

Page 125

1  **A.   It's quite possible, yes.**
2  Q.   "Mark advised that some of the turnover was
3  necessary to upgrade the staff."  Did you say that?
4  **A.   Yes, because I was told to start cleaning house;**
5  **and that's the reason why some people were being exited.**
6  Q.   Who is exiting?
7  **A.   At this time I don't recall those employees, but**
8  **I'm sure that the company has a list of who was terminated.**
9  Q.   And you said you were told.  Who told you that?
10  **A.   It was in a conversation when the client account**
11  **services unit was turning into placement services unit.  Dan**
12  **Yelich and I were present at a meeting with Miss McDonough**
13  **where we were told not to train any of the employees that**
14  **were not good performers in the new process, don't spend**
15  **much time with them, give them the worst jobs and then they**
16  **will leave.  And there was a management phone call with Bob**
17  **Bondi, Miss McDonough, and others, including John Gabel,**
18  **where we were told that -- Bob said, "Are we having" -- "Do**
19  **we have the wrong people in these departments?"**
20  **Miss McDonough said, "We have the right people**
21  **everywhere but except in placement services unit."**
22  Q.   Okay.  Now, these people that were the wrong
23  people, were they just males or females or a mix or what?
24  **A.   At this -- I would say there's a mix.  My**
25  **department had more females in it than males.**

1    Q.  So, more likely that the people that were being
2  exited at Miss McDonough's direction were females?
3    A.  **I wouldn't say that.**
4    Q.  What would you say?  More?  Less?  What?
5    A.  **I don't know because I don't have a list of the**
6  **employees that were exiting.**
7    Q.  But they were both?
8    A.  **I had both male and female employees in my staff**
9  **that were --**
10    Q.  Not performing?
11    A.  **Correct.  However, I don't know at what point**
12  **within the time frame.  I had males in data management,**
13  **which was a subset of the department that I ran.**
14    Q.  But there were other sections you ran; right?
15    A.  **Correct.**
16    Q.  And they had more females in it?
17    A.  **Primarily.**
18    Q.  Was there any direction from one specific group or
19  another?  Did Miss McDonough give you instructions to get
20  rid of just certain people or not people?
21    A.  **No, poor performers.**
22    Q.  Who identified the poor performers?  Was that you
23  identified them or was it she identified them or what?
24    A.  **I don't recall, but I would imagine.  I remember**
25  **one employee in particular, Retta Rhodes.  It was at her**

1  **direction to put her in the lowest job I had.**
2    Q.  Retta Rhodes?
3    A.  **Retta Rhodes.**
4    Q.  Is that a female?
5    A.  **Yes, it is.**
6    Q.  Okay.  Continuing on, "I reminded him that he has
7  had alot of time to get this issue addressed and
8  improvements are too slow coming."  Did she say that?
9    A.  **I don't recall.**
10    Q.  "I also told him that I have been approached by
11  Senior Aon Management who expressed that the field lacks
12  confidence in Mark."  Did she say that?
13    A.  **I would say she probably did.**
14    Q.  Are you aware of whether that's true or not?
15    A.  **I was not aware.  In fact, I believe it's -- I'm**
16  **not aware, and I would disagree.**
17    Q.  Why would you disagree?
18    A.  **Because none of those issues had been brought to**
19  **my attention.**
20    Q.  Well, they were here; right?  I mean, you're
21  saying this is the first time it ever brought to your
22  attention?
23    A.  **Yes, it is.  This is the first time I ever saw**
24  **this.**
25    Q.  And what do they mean by "the field"?  What

1  does -- what does that refer to?
2    A.  **I don't know.  I didn't write this e-mail.**
3    Q.  That's not a term that you're familiar with, "the
4  field"?
5    A.  **Well, I would -- I would -- it could potentially**
6  **be offices outside the Houston office.  It could be the**
7  **offices that we supported.  But I couldn't know for sure**
8  **because I didn't write this e-mail.**
9    Q.  Who would be senior Aon management to Miss
10  McDonough?
11    A.  **I would say Bill Burke would be senior Aon**
12  **management.**
13    Q.  And he's the --
14    A.  **Bob Bondi would be senior Aon management.**
15    Q.  Burke being the head of the Houston office?
16    A.  **Correct.**
17    Q.  Bondi being ...
18    A.  **The head of the Aon client services group.**
19    Q.  Anybody that you would -- you believe she was
20  talking about when she was referring to senior Aon
21  management would be those two guys or somebody else or do
22  you know?
23    A.  **I don't know.**
24    Q.  Were there a lot of women in senior Aon management
25  above Miss McDonough?

1    A.  **I don't know that.**
2    Q.  The two you know would be two males; right?
3    A.  **That's all I know right now.  I couldn't answer.**
4  **I don't know everybody in senior management.**
5    Q.  I'm sure nobody knows everybody at senior
6  management.  It's a big group, isn't it?
7    A.  **Yes, it is.**
8    Q.  Okay.  Continuing on, "This is likely due to his
9  background and that we are still not working closely enough
10  with Syndication."  Do you know what that's all about?
11    A.  **No.  Again, I didn't write the e-mail.  So --**
12    Q.  Did she say that in the meeting?
13    A.  **I can't recall.**
14    Q.  "Example: he and Mark Oakley are just now
15  beginning to get the PSU staff out to meet with syndicators
16  in the field offices."  We kind of already talked about that
17  a little bit?
18    A.  **Yes, we did.**
19    Q.  That's the other e-mail we looked at --
20    A.  **That's correct.**
21    Q.  -- a few minutes ago?
22      Do you believe that that was a problem, that you
23  were just now -- you were just now beginning to get the PSU
24  staff out to meet the syndicators?
25    A.  **The department had gone through a change in the**

Page 130

1  fall of the year. It was implemented October or November.
2  And 1-1 was a very large renewal date. So, taking people
3  out of the office in December would have been detrimental to
4  the workflow process on a large scale. So, after the 1-1
5  renewal date and then a lot of the background work gets done
6  in the month of January and then that's why Mark and I
7  started the process in February.
8      Q.   Okay. Was anything done to Mark Oakley? Was he
9  demoted or terminated?
10     A.   I don't know.
11     Q.   Was it just as much his problem as your problem
12 that the PSU wasn't getting out to meet the syndicators?
13     A.   It was -- it was a work -- a work issue between
14 the two groups. And it wasn't just in the Houston office.
15 It was other offices. And that's why the training program
16 also took place in Chicago.
17     Q.   It says "We are well behind other sites in getting
18 this going." Do you know if that was true or not?
19     A.   I don't.
20     Q.   Did she say that, though, in the -- the meeting?
21     A.   I don't know.
22     Q.   Then it says "We also discussed that of late Mark
23 has not been providing his team leads with early warning
24 reports regarding invoicing and therefore they are not
25 prepared each week to address why items have not been

Page 131

1  billed."
2      A.   I didn't have any statistics to prove that that
3  statement's true.
4      Q.   Did she say that in the meeting, though?
5      A.   I don't know.
6      Q.   Who would be your team leads that would have
7  needed that information?
8      A.   Rachel Morales and Janice Stephens.
9      Q.   So, they would know whether they were getting that
10 information or not?
11     A.   They would know, correct.
12     Q.   Do you know if they had gone to talk to Vicki
13 about those issues?
14     A.   I don't know.
15     Q.   "He agreed that he has dropped the ball in this
16 area recently." Did you say that?
17     A.   No, I did not.
18     Q.   So, you deny that that was discussed?
19     A.   That's correct.
20     Q.   And you deny that that happened?
21     A.   That's correct.
22     Q.   "I have proposed that he move into an AD role in
23 CSU where I feel he could use his skills to be effective."
24 She did say that; right?
25     A.   Yes.

Page 132

1      Q.   "I also suggested he speak with the LA about
2  possible job and finally if he wanted I would create a
3  separation package." Did she -- did she say those two
4  things?
5      A.   Yes, she did.
6      Q.   So, was the LA site the reference to the moving to
7  another position that you talked about as a third option?
8      A.   Could have been, yes.
9      Q.   Were there other opportunities besides moving to
10 LA?
11     A.   Yes, there was.
12     Q.   "He expressed his desire to stay with Aon." Did
13 you say that?
14     A.   Yes.
15     Q.   "He is not interested in going back to claims."
16 Was that a discussion? I guess that's the LA role; is that
17 right?
18     A.   That's not -- that's not correct.
19     Q.   Okay. Was there another job open in claims or
20 something?
21     A.   Not that I'm aware of. And -- and I don't recall
22 that statement.
23     Q.   Was the -- the position that we talked about in
24 Exhibit 9, that was in claims; right?
25     A.   Right. But I didn't have knowledge of that

Page 133

1  communication.
2      Q.   Okay. It says "I suggested he talk to Bob Bondi,
3  Dan Yelich" --
4      A.   Yes.
5      Q.   -- "and Larry DeBoer" --
6      A.   Yes.
7      Q.   -- "(LA) about the opportunities I mentioned."
8  Did she say that?
9      A.   Yes.
10     Q.   And did you do that?
11     A.   I spoke with Bob. I spoke with Dan. And I cannot
12 recall whether or not I called Larry DeBoer or not.
13     Q.   It says "He really wants to stay in PSU and have
14 more time to make it work. I told him that wasn't an option
15 since I don't have more time to work" -- "wait for
16 improvements and that the perception in the field is that he
17 doesn't have the skills to make this work." She says "I
18 told him that wasn't an option." Did she say that?
19     A.   Yes.
20     Q.   Then it says "I told him I wanted his answer soon
21 before he takes vacation in the next week or so." Is
22 that --
23     A.   Yes.
24     Q.   -- accurate?
25     A.   That is accurate.

34 (Pages 130 to 133)

Page 150

1   Q.   How long had you been working for her when you got
2   this?  Looks like maybe, what?
3   A.   **Two months.**
4   Q.   It doesn't really stand out to me as anything
5   saying you're doing a great job or doing a bad job.  It just
6   talks about goals; right?
7   A.   **Correct.**
8   Q.   Did you talk about these future directions and
9   action plans and things like that?
10  A.   **I don't -- I don't recall.**
11  Q.   You did have a meeting with her.  You just don't
12  recall what you discussed?
13  A.   **I -- I couldn't recall whether I actually**
14  **physically sat down and had a meeting or not.**
15  Q.   Did you have any discussions with Miss Parsley
16  about your performance at all during the time you worked
17  with her?
18  A.   **No.**
19  Q.   Did she say you were doing a great job doing
20  anything, a bad job doing anything, just neither way?
21  A.   **I believe there -- there was one e-mail in the**
22  **packet that I provided that may have spoken to a positive**
23  **performance.**
24  Q.   What was that about?
25  A.   **I don't recall right now.  I'd have to look**

Page 151

1   through the pack.
2   Q.   I don't know if I have seen that one.  You don't
3   remember what it was about, though?
4   A.   **I don't offhand.**
5   Q.   When was the next thing that happened that changed
6   your employment in any way?  Any other events that happened
7   chronologically after this evaluation in August?
8   A.   **Specifically meaning ...**
9   Q.   Did you have a discussion with her about any --
10  you said you didn't have a discussion.  When is the next
11  thing that happened relating to your performance or your
12  position?
13  A.   **At one point they had asked about taking on some**
14  **additional responsibilities.**
15  Q.   Tell me about that discussion.
16  A.   **I was asked to -- whether I would be interested in**
17  **taking on the Florida unit.**
18  Q.   The Florida what?
19  A.   **The Florida unit.**
20  Q.   Okay.  So, you were going to supervise the Florida
21  unit?
22  A.   **I was asked if that would be something I was**
23  **interested in.**
24  Q.   And what did you say?
25  A.   **I said I'd be happy to do that.**

Page 152

1   Q.   And what happened?  Did you get -- did you do
2   that?
3   A.   **No.**
4   Q.   Why not?
5   A.   **I don't know.**
6   Q.   Do you know --
7   A.   **It was --**
8   Q.   I'm sorry.  Go ahead.
9   A.   **It was shortly after that that I was told I was**
10  **being terminated.**
11  Q.   Was there a discussion about why you needed to
12  take on the Florida unit?
13  A.   **I believe they were trying to have all three**
14  **assistant directors involved in the entire unit versus**
15  **having just my position being what it was.**
16  Q.   What was your position?
17  A.   **Handling the communications, the call center part**
18  **and the new business unit.**
19  Q.   And why weren't you involved in the whole unit?
20  A.   **Well, I was involved in the whole unit; but those**
21  **were the specific departments that I was responsible for.**
22  Q.   How did that differ from the other assistant
23  directors?
24  A.   **The other assistant directors had units that**
25  **reported directly to or supported direct offices in the**

Page 153

1   other Aon offices.
2   Q.   And, so, there was a impression that you needed to
3   support an office directly?
4   A.   **I was asked if I would like to do that.**
5   Q.   But you never were told why you didn't get the
6   Florida unit?
7   A.   **No.**
8   Q.   That's correct, you were never told?
9   A.   **I was never told why.  I was terminated.**
10          **(Exhibit No. 15 was marked)**
11  Q.   I'm handing you an e-mail which is marked
12  Exhibit 15.  Can you identify that document?
13  A.   **This looks to be an e-mail from Donna Parsley to**
14  **Miss McDonough.**
15  Q.   Have you seen this before?
16  A.   **I have not.  Actually, I have seen this because I**
17  **believe that this was -- let me see.  I believe this was**
18  **part of the EEOC file.**
19  Q.   Let's kind of go over this.  This -- this appears
20  to be an e-mail dated October 30th, and it appears to be a
21  e-mail from Donna to Vicki talking about a meeting she had
22  with you on October 29th.  Is that the same meeting that
23  you -- we have just been talking about with the Florida
24  office or is that something different?
25  A.   **Yes, this would be that same meeting.**

Page 154

1   Q.   Donna says "I had a discussion with Mark the
2   morning of October 29, 2003. Mark and I discussed the
3   functions he was currently performing on a daily basis such
4   as AVX." What's that?
5   A.   I don't recall.
6   Q.   Okay. "Assign" --
7   A.   Some kind of internal database.
8   Q.   "Assignment of LN10s." What's that?
9   A.   Those were new business assignments. So, when a
10  new piece of business would come in, they would complete an
11  LN10; and then we would know that -- to work on a new piece
12  of business.
13  Q.   "Maintaining a new business spreadsheet and
14  transition meetings, fielding team issues for Client
15  Connection and the New Business team (6 people)." Is that
16  an accurate description of what you were doing at that time,
17  those different things?
18  A.   Yes.
19  Q.   She continues on, "He is running open inventory
20  reports, usually once a week, LN30 reports once or twice a
21  month and performs the analysis for the field office reports
22  with contribution from Kim and Tracie for all of the
23  commentary. In addition, I reiterated that his help was
24  also required daily in the CSU que per our last AD meeting."
25  A.   Okay.

Page 155

1   Q.   Is that an accurate description of what she said
2   to you?
3   A.   I would say "yes."
4   Q.   Then it goes on to say that she advised you "that
5   we were continuing to review the current situation with CSU
6   in regard to balancing work loads for the three ADs as 'the
7   current situation was just not working.'" Did she say that?
8   A.   I don't know if those were her exact words.
9   Q.   But there was some discussion, you already
10  mentioned, about balancing the work loads or some --
11  A.   Yes.
12  Q.   -- something like that?
13       "Although the transition of the Dallas/Ft. Worth
14  team did not work out." What -- what's -- what's that all
15  about?
16  A.   I have no idea. That's -- that's the first I saw
17  of it.
18  Q.   Did they --
19  A.   That was not discussed.
20  Q.   It implies that they were trying to transition the
21  Dallas-Fort Work -- Worth work to you.
22  A.   That never happened. No discussion around that.
23  Q.   At least that you're aware of. Maybe -- maybe
24  they were talking about it, but you weren't aware of it or
25  something like that?

Page 156

1   A.   That's true.
2   Q.   "We were still pursuing a way to more equally
3   distribute the internal teams and assignment of field
4   offices." Is that accurate or was that discussed?
5   A.   I would say that's accurate.
6   Q.   "We discussed that the current structure was not
7   providing enough relief to Tracie Jones's team, the largest
8   with 23 staff members, and not positively affecting CSU to
9   the fullest degree." Did she talk about that with you?
10  A.   Yes.
11  Q.   "I stated that we were finding it difficult to
12  carve out enough administrative and report functions within
13  CSU to (1) afford him a full work load and (2) make a
14  positive impact on the AD's duties." Is that right?
15  A.   Yes.
16  Q.   She ends "Furthermore, the current structure was
17  not benefiting the department in the long run since all
18  three team leads could not equally divide staff, field
19  offices and department functions nor fully support each
20  other." Was that accurate?
21  A.   Yes.
22  Q.   "I asked Mark if he had a decision" -- "desire" --
23  I'm sorry. Let me start over. "I asked Mark if he had a
24  desire to and felt that he could take another team (possibly
25  the Florida field offices and team) and effectively handle

Page 157

1   the field office staff, accounts and team issues." And
2   we've already mentioned that that was discussed; right? Is
3   that right or not?
4   A.   Yes, Florida was mentioned, yes.
5   Q.   "He said that this was not an option, I was the
6   Director and he would do" -- "He said that this was not an
7   option." Did you say that?
8   A.   I did not say that.
9   Q.   Do you know why she would say that if you didn't
10  say that?
11  A.   I do not know why.
12  Q.   Miss Parsley continues, "I was the Director and he
13  would do whatever we determined was best for CSU. I also
14  asked if he intended to remain in his current position for a
15  while and again he stated, this was not an option."
16  A.   That -- I did not make that statement.
17  Q.   That implies that you were unhappy and wanted to
18  move someplace else? I mean, is that -- is that what is
19  implied here?
20  A.   I don't know. I didn't make this statement.
21  Q.   Okay. So, you wanted to stay in the position?
22  A.   Yes, I did.
23  Q.   "He said that he had performed so many duties
24  since joining Aon that it really did not matter; he would do
25  whatever was asked of him." Did you say that?

Page 158

1   A.   I said I would do whatever she asked me to do,
2   yes.
3   Q.   "I asked Mark if there were any past or present
4   issues with any of the Florida offices, Atlanta, Nashville
5   or Richmond and he said there were none known to him." Is
6   that accurate?
7   A.   Correct. I wasn't aware of any issues with those
8   offices.
9   Q.   "Mark did request that if he was granted another
10  team that he not continue to be primarily responsible for
11  the CSU que on a daily basis." Is that accurate?
12  A.   I don't recall that.
13  Q.   Could have happened? You just don't know?
14  A.   I don't recall.
15  Q.   "I agreed and he commented that we needed to work
16  more with CSU staff to pull their daily work from the que."
17  Is that -- did she say that?
18  A.   She could have. I don't recall.
19  Q.   "The conversation ended and I advised Mark that I
20  had to discuss this issue further with Vicki McDonough to
21  determine what steps we needed to take and we would get back
22  to him shortly." Is that how the conversation ended?
23  A.   Yes.
24  Q.   Did they get back to you shortly?
25  A.   Yes.

Page 159

1   Q.   What did they say?
2   A.   They terminated me.
3   Q.   Tell me how that happened.
4   A.   I was called into an office. I was told things
5   weren't working out, and I was terminated. I could be -- I
6   could do a special assignment for a month in the surplus
7   lines department.
8   Q.   I can't remember exactly what you said. They
9   called or you were called? Who called you in?
10  A.   Donna came over to my work space and asked me to
11  join her in the conference room. Ernie Joyner was present,
12  Vicki McDonough was present, and then she was present.
13  Q.   Tell me who said what. Sort of do chronologically
14  through the meeting, to the best of your recollection.
15  A.   All I remember is Miss McDonough said things were
16  not working out.
17  Q.   So, Miss McDonough took the lead? It wasn't --
18  A.   Yes --
19  Q.   -- Miss Parsley?
20  A.   -- that's correct.
21  Q.   Okay.
22  A.   And then I was terminated. They had a special
23  project that could be done by me if I wished to take it and
24  that she would provide me with a reference.
25  Q.   Did she offer any explanation for what she meant

Page 160

1   by "it was not working out"?
2   A.   No.
3   Q.   Did Ms. Parsley say anything during the meeting?
4   A.   Not that I recall.
5   Q.   Did Mr. Joyner say anything during the meeting?
6   A.   No, not that I recall.
7   Q.   Was it unusual to have another member of
8   management and an HR person in a termination meeting?
9   A.   No, it was not unusual.
10  Q.   When you had terminated employees, were there
11  sometimes an HR person there?
12  A.   Sometimes.
13  Q.   Do you have any information about who was actually
14  involved in the decision to terminate your employment?
15  A.   I do not have any information about that.
16  Q.   Do you have any information about the basis for
17  the reason it wasn't working out?
18  A.   No.
19  Q.   Did you take that temporary assignment?
20  A.   I did.
21  Q.   Tell me what you did.
22  A.   I worked in the surplus lines unit.
23  Q.   Doing what?
24  A.   Work where you had to pull together information
25  regarding what carriers were not available, what standard

Page 161

1   carriers were not available, and why they were placed with a
2   surplus lines carrier for state filing purposes.
3   Q.   Did you -- was there any sort of announcement made
4   that you were moving or did you see anything from
5   Miss McDonough or Miss Parsley about you moving to another
6   position?
7   A.   Not that I'm aware of.
8   Q.   Did you work that entire month?
9   A.   Yes, I did.
10  Q.   Then what happened?
11  A.   My last day, I believe, was supposed to be one day
12  the first week in December. The very last day I had jury
13  duty. So, I worked every single day. I took -- after I was
14  told I was being terminated, I took three days off, I
15  believe. And then on Monday morning I started in the
16  surplus lines department or thereabouts.
17  Q.   You worked a regular 40-hour week and everything
18  like that?
19  A.   Yes, I did.
20  Q.   Who were you working with on that project?
21  A.   I don't recall the individuals, but --
22  Q.   It wasn't Miss Parsley or Miss --
23  A.   No.
24  Q.   -- McDonough?
25  A.   No.

Page 162

1    Q.   Were you looking for another job within Aon during
2  that time?
3    A.   No.
4    Q.   Did you want another job within Aon?
5    A.   If one was available, I would have -- I would have
6  taken that.
7    Q.   Would it have been incumbent on Miss McDonough and
8  Miss Parsley to look for another job for you?
9    A.   No, no.
10   Q.   But you could have looked for one?
11   A.   That was -- that was one of the options.
12   Q.   They didn't give you an option of a severance
13 package at this time?
14   A.   No.  I was told that because it was a termination,
15 the position was going to be replaced.
16   Q.   Did you have sort of an exit interview with
17 Mr. Joyner?
18   A.   No.
19   Q.   So, he was just in that meeting.  And then you
20 just started another job the next day you worked; right?
21   A.   Correct.
22   Q.   Why do you think the company terminated your
23 employment?
24   A.   Because I was a male, I was discriminated upon, a
25 woman was given my job.  And I disagree with the allegations

Page 163

1  why I was terminated.  And other men had been fired too.
2    Q.   Okay.  Let me -- let me go through each one of
3  those.  Why do you think you being male was a factor in your
4  decision?
5    A.   Because men were spoken to in a hostile manner.
6    Q.   Who did that?
7    A.   Miss McDonough.
8    Q.   Who did she speak to in a hostile manner?
9    A.   I would say I was spoken to in a hostile manner.
10 Dan Yelich was spoken to in a hostile manner.  John Gabel --
11   Q.   Dan Yelich?
12   A.   John Gabel was also spoken to in a hostile manner.
13   Q.   Did she ever speak to women in a hostile manner?
14   A.   I don't know.  I didn't -- I don't recall seeing
15 that.
16   Q.   How do you know that Dan and John -- Dan Yelich
17 and John Gabel were spoken to in a hostile manner?
18   A.   Because I was in meetings with them at the time.
19   Q.   Was it, like, a staff meeting where there's a
20 bunch of people or just you and them and her or what?
21   A.   Staff meetings.
22   Q.   So, other people would have seen this?
23   A.   Uh-huh.
24   Q.   Yes?
25   A.   Potentially.

Page 164

1    Q.   You have to answer orally.
2    A.   Potentially.
3    Q.   And you never saw her speak harshly to any females
4  on the staff?
5    A.   I did not see that, no.
6    Q.   Any other reason you believe it was because of a
7  man that you were terminated?
8    A.   Please repeat the question.
9    Q.   Yeah.  I -- I'm just going to go through every
10 reason you believe you were terminated because of your
11 gender.
12   A.   Okay.
13   Q.   So, you said because men were spoken to harshly.
14 Any other reason?
15   A.   I also said that my performance -- I -- I believe
16 that the statement why I was terminated is false.
17   Q.   That it wasn't working out?
18   A.   That's correct.
19   Q.   Or was there some other reason?
20   A.   It was because of my gender.  That was the reason.
21   Q.   Why do you believe that it wasn't working out was
22 false?
23   A.   Because I had no information to document
24 otherwise.
25   Q.   Had you -- you had, however, talked -- had

Page 165

1  received information from Miss McDonough that there was
2  problems, at least that she felt; right?
3           MR. FIDDLER:  Objection, form.
4    Q.   (BY MR. NOTESTINE)  In the meeting that we looked
5  at before when she demoted you, there was some discussions
6  about problems; right?
7    A.   Yes, there was discussions about problems.
8    Q.   Had those been resolved, to your knowledge?
9    A.   I was demoted.  I don't agree that -- that there
10 were problems.
11   Q.   Anything else that supports that the reason given
12 for your termination was false other than your disagreement?
13 Anything else that you can use to support that the actual
14 reasons were false?
15   A.   I don't have any documentation that would show I
16 did a bad job.
17   Q.   You mentioned other men were terminated --
18   A.   Yes.
19   Q.   -- is another reason.  Who else was terminated?
20   A.   John Canter was terminated.  And Bob Hamilton
21 was -- quit because, from my understanding, Miss McDonough
22 would not speak to him after -- sometime after his
23 employment.  So, he quit to take a different job.
24   Q.   So, Bob was moved to another position?
25   A.   No.  He left the company.

42 (Pages 162 to 165)

Page 166

1    Q.   Okay.  So, he was never demoted or moved to
2  another position.  He just left the company?
3    A.   That's correct.
4    Q.   Canter had moved to another position?
5    A.   That's correct.
6    Q.   Is he still with the company?
7    A.   I don't know.
8    Q.   To your knowledge, was he ever terminated?
9    A.   He was terminated from the director's position,
10  yes.
11    Q.   Moved out of her group into somebody else's group?
12    A.   That's my understanding.
13    Q.   But still with the company at least at that point?
14    A.   Yes.
15    Q.   Had she ever terminated any females?
16    A.   I don't know.
17    Q.   Well, you told me before that she told you to
18  terminate assistant director Mary -- Marye Ann Turner;
19  right?
20    A.   Marye Ann Tucker.  I terminated Marye Ann Tucker.
21    Q.   Okay.  But you said that you -- that she came in
22  and just told you to fire her?
23    A.   Yes.  And she was present -- and she was present
24  at the firing.
25    Q.   So, that's one female.  Any other females that she

Page 167

1  terminated, to your knowledge?
2    A.   I don't have any knowledge.
3    Q.   What about all the people that worked under you
4  that she told you to just stick in some position, not train
5  them and get rid of them?  Those were some females, weren't
6  they?
7    A.   Retta Rhodes.
8    Q.   Anybody else you know that she instructed you to
9  terminate or terminated herself?
10    A.   No.
11    Q.   How many women were working in the group that
12  Miss McDonough supervised at the time of your termination?
13    A.   I don't know.
14    Q.   Can you tell us numbers or percentages or
15  anything?  Did it increase or decrease or was there any
16  change, to your knowledge?
17    A.   When I was demoted, there was one man left; and
18  the rest of them were women.
19    Q.   One man left in the whole department?
20    A.   All the directors, one man of directors.
21    Q.   When you started, how many were there?
22    A.   Including me, although I did not report to her
23  directly at that time, four.
24    Q.   Who were they?
25    A.   Obviously me, Dan Yelich, Bob Hamilton, and John

Page 168

1  Canter.
2    Q.   Okay.  These are the other people you mentioned
3  already?
4    A.   Yes.
5    Q.   At the time of your termination, though, you were
6  assistant director.  Do you know what the -- the demographic
7  breakdown was from the time you began as assistant director
8  until the time you ended?
9    A.   I don't right now, no.
10    Q.   I assume there would have been many more than four
11  assistant directors; is that right?
12    A.   In the entire -- yes.
13    Q.   Group?  Okay.  Do you know who replaced you when
14  you -- when you were terminated?
15    A.   I believe her name was Rochelle Simone.
16    Q.   How do you know that?
17    A.   Because I took the special assignment and I was
18  still employed there at the time.
19    Q.   Do you have any knowledge of her qualifications?
20    A.   I don't believe that she has a advanced degree.
21    Q.   Any knowledge about her experience or insurance
22  background or anything like that?
23    A.   All I understand is she had worked for the company
24  before, but I don't know.  She had been out of the -- she
25  had never been involved in the Aon client services.

Page 169

1    Q.   Do you know what her salary was when she was
2  hired?
3    A.   I do not.
4    Q.   Any other reason you believe that your termination
5  was because of your gender?
6    A.   Well, because I was obviously male.
7    Q.   Right.
8    A.   I disagree with the reason for termination.
9    Q.   Right.
10    A.   Other men had been fired.
11    Q.   Right.
12    A.   And I was told that a woman would be sitting at my
13  desk when I came back.  So, that's why -- I was called at
14  home and told that I would be moving to a different position
15  at a different desk.
16    Q.   Okay.  Who said that?
17    A.   Donna Parsley did.
18    Q.   Did she say another woman would be there or that
19  they had hired somebody to replace you?  Did she use the
20  word "woman" in your discussion?
21    A.   To my recollection, she did.
22    Q.   She didn't say, however, she was replacing you
23  because she was a woman, just that there was a woman who was
24  going to be sitting in your desk?
25    A.   Correct.

43 (Pages 166 to 169)

Page 182

1  Does that somehow demonstrate you were discriminated against
2  based on your gender?
3     A.  No.
4     Q.  "On 11/6/2003 Donna Parsley called me at home to
5  say that they hired a woman to replace me and she would be
6  sitting at my desk when I returned."  And we've -- we've
7  talked about that; right?
8     A.  Yes.
9     Q.  Okay.  Then "What did your race, color, national
10 origin, religion, sex, age, or disability, have to do with
11 the action taken against you?"
12    "Allegation #1:  In 2001 their [sic] were four
13 male Directors.  Vickie" -- and we've talked about those
14 four people; right?
15    A.  Yes.
16    Q.  "Vickie McDonough became the Managing Director in
17 early 2002, and by November 2003 only one male Director
18 remained."  And that was Dan Yelich; right?
19    A.  Yes.
20    Q.  We've talked about that already; right?
21    A.  Yes, we have.
22    Q.  "The remaining male Director is age 47+."  Is that
23 the 47-year-old we're talking about?
24    A.  No.  If you -- if you're familiar with the form,
25 it's a form you would just circle what applies to you.

Page 183

1     Q.  Okay.  So, the only people that could fill out
2  that form were people that are born on --
3     A.  No.  The form --
4     Q.  -- October 30th, 1952?
5     A.  No.  The -- the options are preprinted, and you
6  circle the appropriate ones.
7     Q.  Okay.  "This Director has been reassigned three
8  times in the last six months including an extended
9  assignment in another state."
10    A.  Yes.
11    Q.  Is that true?
12    A.  Yes.
13    Q.  Is that an adverse thing against Mr. Yelich?
14    A.  Yes.
15    Q.  Why is that?
16    A.  It shows that she was trying to move him into as
17 many different locations outside of her service center as
18 possible and other positions within the service center.
19    Q.  Okay.  But he wasn't terminated, though; right?
20    A.  No, he was not.
21    Q.  Then continuing on, "I never received a
22 performance review or a negative counseling report while
23 employed by Aon."  And is that correct?
24    A.  That's correct.  The only thing I received in
25 paper was what Donna Parsley gave.

Page 184

1     Q.  Okay.  Do you know if other people got performance
2  reviews?
3     A.  I do not know.
4     Q.  Now, certainly your supervisors talked to you
5  about concerns they had about your performance, didn't they?
6     A.  Specifically ...
7     Q.  Donna -- didn't Vicki McDonough talk about
8  problems she was having with you when she demoted you?
9     A.  In her opinion that was it, yes.
10    Q.  There were people that talked to you.  Are you
11 referring to some specific document when you say "negative
12 counseling report"?
13    A.  Yes.
14    Q.  What's a negative counseling report?
15    A.  There was no performance appraisal or a counseling
16 report filled out to document poor performance.
17    Q.  Does Aon have a document that says at the top
18 "Negative Counseling Report" or something like that?
19    A.  I don't recall.
20    Q.  I'm just wondering if you -- do you mean a
21 specific document that you never got or if that is something
22 different than the discussions that you've had with your
23 supervisors?
24    A.  Well, a specific document would be a performance
25 appraisal, which was a standardized appraisal throughout the

Page 185

1  country.
2     Q.  Okay.  It says "My last merit increase was on
3  April 1st, 2003 and was reflective of the company's standard
4  increase."
5     A.  Yes.
6     Q.  Was that an adverse action?
7     A.  No.
8     Q.  "I received more than an adverse bonus."  Is that
9  an adverse action?
10    A.  No.
11    Q.  It says "Provide the names of the" -- I'm on the
12 next page.
13    A.  Okay.
14    Q.  "Provide the full names of the employees in same
15 or similar positions to you, that were treated differently
16 by the Respondent under similar conditions.  Sharon Patin."
17 Who's Sharon Patin?  What did she do?
18    A.  She took the position that I had after I was
19 demoted.
20    Q.  Donna Parsley?
21    A.  She held the position of the department I was told
22 I couldn't have.
23    Q.  Kimberley Overgoner?
24    A.  She held the position of the department that I was
25 told I could not have.

47 (Pages 182 to 185)

Page 190

1   statement or anything like that from them?
2       A.   I don't remember.
3       Q.   And I'm not going to go over the details of this.
4   They basically describe the facts, and they said the
5   evidence was insufficient to establish a violation. Did you
6   follow up with them in any way?
7       A.   Yes. I sent a -- well, yes.
8       Q.   Okay. Well, tell me what you did after you
9   received this.
10      A.   I filed a -- a request with the EEOC to review the
11  file.
12          (Exhibit No. 19 was marked)
13      Q.   Hang on. I'm handing you what's been marked
14  Exhibit 19. Is that the next thing you did, Exhibit 19
15  there?
16      A.   Oh, yes, that's correct. So -- so, I answered.
17      Q.   Sort of point, counterpoint?
18      A.   Wait. That's correct. It was in response to this
19  document.
20      Q.   So, you sent it back to the Texas Workforce
21  Commission Civil Rights Division and sort of --
22      A.   Yes, that's correct.
23      Q.   Let's look at a couple things in here. At the top
24  of Page 2 we've already talked about Marye Ann Tucker?
25      A.   Yes.

Page 191

1       Q.   I want to read the last sentence. "Following
2   Miss McDonoho's [sic] instructions I terminated Miss Tucker
3   on June 28, 2002 with great reservations as Miss Tucker had
4   never been written up or counseled and her previous
5   performance appraisal was satisfactory." I don't think you
6   mentioned that she had never been written up or counseled
7   and her previous employment appraisal was satisfactory.
8   Were you specifically aware of that? Did you, like, look at
9   her file or something?
10      A.   Yes. I was given her performance appraisal.
11      Q.   Who gave it to you? Was it HR or something?
12      A.   Yes.
13      Q.   And were you aware that she had never been written
14  up or counseled?
15      A.   Yes.
16      Q.   How did you know that?
17      A.   It wasn't in her file.
18      Q.   Okay. But yet, nevertheless, Miss McDono -- Miss
19  McDonoho [sic] --
20          MS. McDONOUGH: McDonough.
21          MR. NOTESTINE: McDonough. Sorry.
22      Q.   -- told you to terminate her?
23      A.   Yes.
24      Q.   And she was an assistant director, just the same
25  position that you held when you were terminated; right?

Page 192

1       A.   Yes.
2       Q.   Let's skip down a little bit. At the very bottom
3   paragraph it says "Four weeks later on May 5th, 2003,
4   Ms. McDonough informed me that she no longer wanted me in
5   the position and my options were to take a demotion to
6   Assistant Director of the Client Services Unit or to accept
7   a severance package. Knowing that Donna Parsley, Director
8   of Document Production" -- it sounds like a lawyer's job --
9   "was going to be appointed to Director of CSU, I inquired
10  into being the Director of Document Production.
11  Ms. McDonough told me 'you wouldn't want that position' and
12  I couldn't have it because Miss Parsley had 'raised the bar'
13  and the position required someone with many years of
14  insurance experience." We have already talked about that;
15  right?
16      A.   Yes.
17      Q.   Did Miss Parsley have many years of insurance
18  experience?
19      A.   I don't know.
20      Q.   "I later learned that Ms. McDonough appointed
21  Kimberley Overgoner to the position, a woman, and she had
22  not completed any education beyond a High School Diploma,
23  and she had no insurance experience." We've already talked
24  about that; right?
25      A.   Yes.

Page 193

1           MR. FIDDLER: Kerry, when you get to a
2   breaking point, we can just take a break. I need to talk to
3   my legal assistant before she leaves. So, in the next ten
4   minutes or something.
5           MR. NOTESTINE: Okay. Let me just finish
6   this document. It will just take a minute.
7       Q.   (BY MR. NOTESTINE) The next paragraph deals
8   somewhat with some disputes, and I want to kind of identify
9   a couple sentences I don't think we have talked about. In
10  the middle of the paragraph it says "In response to your
11  letter, the statement that the Dallas field office objected
12  to the reassignment of the Dallas office to me is false."
13  Is that accurate?
14      A.   I had no knowledge that they had objected to
15  reassignment of their office to me. I was not aware that
16  that was even an option.
17      Q.   Well, why would you know it was false if you
18  didn't know about that?
19      A.   Because we had talked about the Florida unit, not
20  the Dallas office.
21      Q.   Was there -- so, there could have been discussion
22  about the Dallas office objecting to the reassignment of the
23  Dallas office to you that you wouldn't have known about;
24  right?
25      A.   Potentially.

49 (Pages 190 to 193)

1   Q.  Nevertheless, you said it was false; right?
2   A.  Yes.
3   Q.  Near the end of the paragraph it says "The
4 allegation that the field office rejected the reassignment
5 of their unit to me based on their experience with me as
6 Director of PSU is also false because I let Peter McKenzie,
7 the head of the Dallas office and his Associate, Annie
8 McCarly, hand pick the Specialists they wanted to work on
9 their team to ensure their satisfaction." What's that all
10 about?
11   A.  I let them pick the exact employees that they
12 wanted to work on their work.
13   Q.  Okay. Well, why would that mean that they weren't
14 upset about your performance?
15   A.  It just says that I let them hand pick who they
16 wanted. So, they got to pick the exact employees that they
17 wanted.
18   Q.  Okay. The next paragraph says "On October 13,
19 2002, I met with Miss McDonough at her request. She stated
20 that when she offered me the position as Assistant Director
21 of CSU it was with the understanding that I would remain at
22 the same salary without the opportunity for merit increases
23 or a bonus." Was that discussed?
24   A.  Yes.
25   Q.  Tell me what that discussion was.

1   A.  I was told that when I took the demotion that I
2 would be capped, salary capped.
3   Q.  Why was that?
4   A.  Because it was higher than, I guess -- I don't
5 know why.
6   Q.  Was there -- was there salary bands and you could
7 only go up a certain --
8   A.  Yes.
9   Q.  -- amount in a particular position?
10   A.  Yes.
11   Q.  Then it says "She stated she had a conversation
12 with Human Resources and, according to Miss McDonough, they
13 expressed a concern that my salary was much higher than the
14 two other Assistant Directors in CSU. She stated that it
15 may pose a problem because I was a man and the other
16 Assistant Directors were women." Did she talk -- say that
17 to you?
18   A.  Yes, she did.
19   Q.  Is that the complete extent of the conversation?
20   A.  Yes, it is.
21   Q.  And this was October 13, 2002 and it related to
22 why your salary was capped; right?
23   A.  Yes.
24   Q.  Do you believe you -- your salary was capped as --
25 was discriminatory towards you?

1   A.  No.
2   Q.  I don't have time to go over everything in here;
3 but I'm skipping over to Page 4 of this document, sort of
4 the third full paragraph. You refer there to your
5 performance -- well, that whole paragraph says "On March 26,
6 2003 during a meeting held by Joe Propati, the Managing
7 Director who filled in for Miss McDonough while she was on
8 sick leave, he outlined the fact that PSU was understaffed
9 by 13 employees where PMU was only short one employee
10 (Exhibit 13). The evidence shows that given the shortage of
11 allocated staff for my department, my performance was still
12 on par with that of my peers." Was Joe Propati criticizing
13 you because you were understaffed?
14   A.  No.
15   Q.  What did -- how did this show that you were on par
16 with your peers that you had 13 fewer employees?
17   A.  There is an LN40 report that's contained in the
18 documents that were provided that shows -- and it's in this
19 letter -- that shows that my performance based on those
20 documents was just as good, if not better than the other
21 three service centers.
22   Q.  Why would an LN40 report show that? And I don't
23 think I have seen that.
24   A.  It -- it shows --
25   Q.  Does it list your performance evaluations or

1 something?
2   A.  For your unit as far as whether or not you meet
3 the goals for getting those LN40s taken care of.
4   Q.  What is PMU?
5   A.  Policy management unit.
6   Q.  This paragraph says "Miss Patin's performance
7 however, was significantly worse than that of her peers
8 while her department was appropriately staffed." Were her
9 peers --
10   A.  It was based on those -- go ahead.
11   Q.  Were her peers you? Does that include you or is
12 that somebody else?
13   A.  Yes, it includes me. I apologize. No. That
14 includes the other directors with a similar position that
15 she had in the other three service centers.
16   Q.  Those are people around the country?
17   A.  That's correct.
18   Q.  Are those males or females?
19   A.  I don't know.
20   Q.  "Although Miss Patin seemingly had more brokerage
21 experience than me." Why would you say that?
22   A.  She had worked for Aon for a very long time.
23   Q.  "Given her poor performance as Director of PMU it
24 would be difficult to propose that she was more qualified
25 and would be more successful than me as the Director of

Page 198

1  PSU." And that's that LN40 you were talking about; right?
2      A.  Correct.
3          MR. NOTESTINE:  Okay.  Let's take a break.
4          THE VIDEOGRAPHER:  Going off the record.
5  The time is 3:57 p.m.
6          (Recess taken)
7          (Exhibit No. 20 was marked)
8          THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 4:14 p.m.  This is Tape No. 3.
10     Q.  (BY MR. NOTESTINE)  Mr. Hansen, I'm handing you
11  what's been marked as Exhibit 20.  Can you identify that,
12  please?
13     A.  Yes.  This is the lawsuit paperwork that I
14  completed at the federal court.
15     Q.  Do they have some sort of form they give you with
16  these blanks, and you just kind of go in there and fill
17  these blanks out?  Is that what they do?
18     A.  Yes, they do.
19     Q.  I believe we have talked about all the factual
20  allegations in here to the extent that they have any.
21          THE REPORTER:  Excuse me?
22          MR. NOTESTINE:  Factual allegations.
23     Q.  (BY MR. NOTESTINE)  To the extent that there are
24  any factual allegations, it's pretty sparse.  Look at No. 5.
25  It says on the date of July 12, 2005 you received a right to

Page 199

1  sue letter from the EEOC.  And that was a different form
2  than you got from the TWC; right?
3      A.  Yes.
4      Q.  You got one from both entities; right?
5      A.  Yes.
6      Q.  And the one you got from the EEOC was on
7  July 12th?
8      A.  Yes.
9      Q.  I want to make sure that's right as opposed to
10  that's when you got the one from the TWC.
11     A.  No, that's the one from the EEOC.
12     Q.  Let's go over the last page of this document.
13  It's a civil cover sheet.  I notice that there is no
14  reference to a jury demand in the -- in the employment
15  discrimination complaint.  And there's a place on the civil
16  cover sheet sort of at the bottom right-hand corner where it
17  says "CHECK YES" and it says "JURY DEMAND" and there's not
18  checked "Yes" or "No."  Is there some reason why you didn't
19  ask for a jury demand in your employment discrimination
20  complaint?
21     A.  I was -- I was pro se at that point, and I did not
22  know what that asked for.
23     Q.  You do know what a jury is; right?
24     A.  Yes, I do.
25     Q.  Did you -- did you notice there that they wanted

Page 200

1  you to check "Yes" or "No" and you just didn't fill it out
2  or --
3      A.  I don't remember now.
4      Q.  When you filed this lawsuit, you didn't have a
5  lawyer representing you; right?
6      A.  Correct.
7      Q.  When -- when did you secure Mr. -- I'm not going
8  to ask you what he told you, but when did you secure
9  Mr. Fiddler's help?
10     A.  In January.
11     Q.  Did you make any attempts to serve the company
12  before you secured the help of Mr. Fiddler?
13     A.  No.
14     Q.  Why not?
15     A.  Because you had to file a lawsuit in order to get
16  a copy of the EEOC file.
17     Q.  So, you filed the lawsuit so you could go back and
18  get the EEOC file?
19     A.  Yes, I did.
20     Q.  And why -- why would that make any difference?
21     A.  Because I wanted to see what the full file looked
22  like.
23     Q.  What the company had said about the situation?
24     A.  Yes.
25     Q.  And did that make a difference in what you did?

Page 201

1      A.  No.
2      Q.  Once you read what the company said, is that when
3  you then went to find a lawyer?
4      A.  Yes.
5      Q.  And that's when you found Mr. Fiddler?
6      A.  Yes.
7      Q.  Did you -- when did you decide you wanted a jury
8  in this case?
9          MR. FIDDLER:  I'm going to instruct the
10  witness not to answer.
11     Q.  (BY MR. NOTESTINE)  Are you refusing to answer
12  upon your lawyer's request?
13     A.  Yes.
14     Q.  Are you aware of any females that were demoted or
15  terminated by the company?  I think we talked about Marye
16  Ann Tucker.
17     A.  Yes.
18     Q.  We talked about somebody else.
19     A.  Charlene Headley.
20     Q.  Yeah.  Anybody else that you're aware of?
21     A.  I don't recall right now.
22     Q.  Any other males you know of that were poor
23  performers that were not terminated?
24     A.  No, I don't know.
25     Q.  You don't know any?

Page 202

1    A.  No.
2    Q.  And you've told us the only ones you know -- the
3  males you know of who were terminated; right?
4    A.  Yes.
5        (Exhibit No. 21 was marked)
6    Q.  I'm handing you what's been marked Exhibit 21.
7  And can you identify that, please?
8    A.  This is a First Amended Complaint.
9    Q.  And this -- this was filed after you secured the
10 assistance of Mr. Fiddler; right?
11   A.  Yes.
12   Q.  Okay.  I -- I kind of just want to make sure that
13 I have got all the information that you believe supports
14 your claims against Aon in this case.  Okay?
15   A.  Yes.
16   Q.  Okay.  So, let's turn to Page 2 of this document
17 and -- okay.  We're just going to go -- "STATEMENT OF CAUSES
18 OF ACTION."  We're going to go down the list here.  Okay?
19   A.  Yes.
20   Q.  Okay.  I guess I haven't asked you that, but
21 obviously you're here on video here.  So, we know that
22 you're a male; right?
23   No. 6, "Hansen began working at AON Risk Services
24 on May 3rd, 2001."  And we've talked about that; right?
25   A.  Yes.

Page 203

1    Q.  7, "Hansen was a good performer and regularly
2  received merit pay increases and larger than average
3  bonuses, and never received a written warning or written
4  reprimand."
5    A.  Yes.
6    Q.  Okay.  What evidence do you have that you were a
7  good performer?
8    A.  The merit increases that I received.
9    Q.  Okay.
10   A.  There was also some e-mails that were within the
11 packet that said -- comments that I had been a good -- had
12 done a good job.
13   Q.  The stuff that you submitted to the TWC?
14   A.  Yes.  No.  Yes.  Yes.
15   Q.  Was there anything else other than what you
16 submitted to the TWC?
17   A.  No.  No.
18   Q.  You then said you received merit increases.
19 And I believe you got a merit increase in April of 2002;
20 right?
21   A.  Yes.
22   Q.  And then one in April of 2003; right?
23   A.  Yes.
24   Q.  Okay.  You said you got larger than average
25 bonuses.  How do you know that?

Page 204

1    A.  It was -- if I recall correctly, it was a $15,000
2  bonus.
3    Q.  How do you know that was larger than average?  I
4  don't know.  Is that -- do you know that that's larger than
5  average?
6    A.  It would be larger than the average person.
7    Q.  Would it be larger than the average person at your
8  position, like, a director or --
9    A.  I don't know that.
10   Q.  So, you got -- didn't you get 10,000 the first
11 time in April of 2002?
12   A.  I don't recall the specific bonuses.
13   Q.  15 was the second one?
14   A.  I believe so.
15   Q.  And do you know what -- you don't know what other
16 people got in that position; right?
17   A.  I do not.
18   Q.  Then it says you never received a written warning
19 or a written reprimand.  Was there a specific form that you
20 had to receive in order to get a written reprimand or a
21 written warning?
22   A.  No.
23   Q.  There were things in writing about your
24 performance, though, right, like some of these e-mails we
25 looked at and things?

Page 205

1    A.  There are e-mails in this packet, yes.
2    Q.  Why wouldn't that be a written reprimand?
3    A.  Because they weren't shared with me.
4    Q.  Okay.
5    A.  I was not made aware of those documents.
6    Q.  Sort of -- I'm sorry.  Go ahead.
7    A.  No.  Go ahead.
8    Q.  Did you receive oral warnings and oral reprimands?
9    A.  No.
10   Q.  Your position is you were never talked to about
11 your performance?
12   A.  No.
13   Q.  That is your position?  That's not your position?
14   A.  My position is I was not spoken to about my
15 performance.
16   Q.  Okay.  No. 8, "When Hansen began with AON Risk
17 Services, there were four male Directors in the Houston
18 Service Center including Hansen."  We have talked about
19 that; right?
20   A.  Yes.
21   Q.  And you've identified those people; right?
22   No. 9, "In early 2002, Vicki McDona" --
23 "McDonough, Managing Director, became Hansen's direct
24 supervisor."  We talked about that; right?
25   A.  Yes.

52 (Pages 202 to 205)

Page 206

1   Q.   "While McDonough was Managing Director she
2   terminated two of the male directors and a third resigned."
3   A.   Yes.
4   Q.   And we talked about that; right?
5   A.   Yes.
6   Q.   One's you.  One's Mr. Canter that really
7   transferred; right?
8   A.   I believe he was terminated from the position he
9   was in.
10  Q.   And the third resigned, and that was Bob?
11  A.   Bob Hamilton.
12  Q.   "McDonough replaced all three of these men with
13  females."  Who replaced them, to your knowledge?  I don't
14  know whether I've asked you that.
15  A.   Please repeat that.
16  Q.   I don't think I've ever asked you that.
17  A.   Please repeat that.
18  Q.   Who -- who replaced Canter?
19  A.   I replaced Canter initially, and then Sharon Patin
20  replaced me.
21  Q.   Who replaced Bob?
22  A.   Donna Parsley.
23  Q.   10, "On May 5th, 2003, McDonough demoted Hansen to
24  the position of Assistant Director.  Donna Parsley became
25  Hansen's direct supervisor."  We have talked about that;

Page 207

1   right?
2   A.   Yes.
3   Q.   11, "Instead, McDonough gave the Director,
4   Document Production job to a less qualified female."  That
5   was Overgoner?
6   A.   Yes.
7   Q.   "The female who was given the job had no insurance
8   experience at the time.  Hansen had nine years."  We have
9   talked about that; right?
10  A.   Yes.
11  Q.   12, "Then, on November 4th, 2003, McDonough
12  notified Hansen he was going to be terminated, but asked him
13  to stay on for one month to complete a special assignment."
14  We have talked about that; right?
15  A.   Yes.
16  Q.   Any other facts that support your belief that you
17  were discriminated against in the termination of employment
18  other than what we have talked about so far today?
19  A.   No.
20  Q.   No. 13, "On November 6, 2003, Parsley called
21  Hansen and told him AON Risk Services had hired a woman to
22  replace him and she (the woman) would be sitting at his desk
23  when he returned."  We talked about that already; right?
24  A.   Yes, we did.
25  Q.   You then talk about the fact you were

Page 208

1   discriminated against based on your gender.  "Gender was a
2   motivating factor in Defendant's decision to demote
3   Plaintiff, and deny him a transfer and terminate him."  And
4   we've talked about all the facts that support that, haven't
5   we?
6   A.   Yes.
7   Q.   No. 15, "As a result of Defendant's conduct,
8   Plaintiff has suffered damages by way of loss of back pay
9   and benefits."  Okay.  Have you told us how much you were
10  making at the time of your termination?
11  A.   Yes.
12  Q.   How much was that, 120-something?
13  A.   It was 123,800.
14  Q.   And do you know what benefits you lost?  Can you
15  tell us what benefits you lost?
16  A.   I don't recall the specifics.
17  Q.   Do you --
18  A.   But it would be medical benefits.
19  Q.   Do you have benefits currently?
20  A.   No.
21  Q.   You're not on any sort of plan or anything like
22  that?
23  A.   No.
24  Q.   Do you have -- are you on COBRA continuation or
25  anything?

Page 209

1   A.   No.
2   Q.   So, you don't have any medical coverage at all?
3   A.   That's right.
4   Q.   Do you have any other, you know, life insurance or
5   anything else like that?
6   A.   I do have life insurance.
7   Q.   Anything else?  Any other benefits you have in
8   your current job other than life insurance?
9   A.   No.
10  Q.   Front pay.  Okay.  What front pay have you lost?
11  Do you know?
12          MR. FIDDLER:  Objection, form.
13  Q.   (BY MR. NOTESTINE)  Let me ask this:  How long do
14  you think it's going to take before your -- your franchise
15  business starts making money?
16  A.   I don't know.
17  Q.   Do you have any projections or anything?
18  A.   No.
19  Q.   But you're not looking for another job?
20  A.   No.
21  Q.   So, you obviously think it's going to pay off at
22  some point?
23  A.   Yes.
24  Q.   No idea when that would be?
25  A.   No.

Page 218

1   A.   I don't know.
2   Q.   Last document.
3        (Exhibit No. 23 was marked)
4   Q.   I'm handing you what's been marked Exhibit 23.
5   Can you tell us what that document is?
6   A.   This is the timeline that I put together while I
7   was an employee.
8   Q.   We have talked about this a couple times; right?
9   A.   Yes.
10  Q.   And, again, I don't want to go over this whole
11  thing; but tell me what the first page is essentially.
12  A.   It's a description of the units that were
13  contained within the CSU.
14  Q.   And those kind of changed around sort of weekly;
15  right?
16  A.   Yes.
17  Q.   And this is kind of an interesting little chart on
18  the next couple of pages.  What's all -- what's all this?
19  A.   These are the staff changes that took place while
20  I was an employee.
21  Q.   Now, there always were these different departments
22  here; and then you just kind of put who was the person
23  working in those departments at that time?
24  A.   Yes.
25  Q.   And how did you do that?  Did you just remember

Page 219

1   that or is that something you kind of kept as you went
2   along?
3   A.   I kept as I went along.
4   Q.   And if there's blanks -- for example, you look
5   down under "Winter 2002."  And under "CRS" there's nobody.
6   Does that mean Dan's still there or --
7   A.   Yes.
8   Q.   So, it's just -- if it's not filled out, it
9   doesn't mean nobody's there.  It just means that there's no
10  change there; is that right?
11  A.   Yes.
12  Q.   Here's this example.  "Karen Pon asked to leave."
13  Who is Karen Pon?
14  A.   She was an assistant director in the client
15  connection unit.
16  Q.   And who did she report to?
17  A.   Mary Salazar.
18  Q.   Do you know why she was asked to leave?
19  A.   I do not.
20  Q.   "Sherrie Purvis demoted to Senior Specialist."
21  Who is Sherrie Purvis?
22  A.   Sherrie Purvis was a assistant director in my unit
23  in technical operations.
24  Q.   Who did that, demoted her?
25  A.   I did.

Page 220

1   Q.   Why did you do that?
2   A.   Because her performance was not up to par for an
3   assistant director.
4   Q.   At the top of the next page it says "Mark Hansen
5   replaces John Canter as Director of CAS."
6   A.   Yes.
7   Q.   You mentioned that before.  Who -- who put you in
8   that position?
9   A.   Miss McDonough.
10  Q.   Then it says "Rachel Morales transfers to be AD of
11  DM."  That's just a line of people working for you; right?
12  A.   Excuse me?
13  Q.   She was one of the people working for you?
14  A.   Yes.
15  Q.   Summer of 2002, Lauretta Hines, who's that?
16  A.   She was an employee in document control.  She was
17  an assistant director.
18  Q.   Who terminated her?
19  A.   I don't know.
20  Q.   Is that somebody that reported to Miss McDonough?
21  A.   I don't know.
22  Q.   Here's Shari Asher is terminated in the fall of
23  2002.  Who is she?
24  A.   She was an assistant director in Aon Natural
25  Resources.

Page 221

1   Q.   Is this a department that reported to Miss
2   McDonough?
3   A.   At one point, yes.
4   Q.   Do you know if she was terminated by
5   Ms. McDonough?
6   A.   I don't know that.
7   Q.   Fall of 2003, Suzette Rosser resigns.  Do you know
8   why she resigned?
9   A.   No, I don't know why.
10  Q.   Below that it says "Kay Rein terminated.  Accepts
11  nonmanagement position in CSU."  Do you know what happened
12  there?
13  A.   No.
14  Q.   Do you know who she reported to?
15  A.   No.
16  Q.   I assume Kay is a female; right?
17  A.   Yes.
18  Q.   There's a little demographic chart at the bottom
19  of Page 2250, and that's something you put together just
20  from your recollection?
21  A.   Yes.
22  Q.   So, you went from 2001 four men and three women as
23  director to one man and five women; right?
24  A.   Yes.
25  Q.   And assistant directors were four men, 16 women,

Page 222

1  and there was one fewer of each by 2003; right?
2     A.  Yes.
3     Q.  Okay.  Let's -- let's look at the timeline, which
4  is on the next page.  Okay.  I'm not going to go over
5  everything in here, but a few things.  Under July 2001,
6  second paragraph there, "Sr. Management conference call
7  Vicki complains to Bob that I am not cooperating."  What was
8  that all about?
9     A.  I worked for John Gabel, and John Gabel asked me
10 for employment statistics as far as how many employees I
11 had.  I provided him the information.  Stephanie Stephens
12 called, asked me for the same information.  And I said I had
13 provided it to John.  "If you still need it, let me know."
14 She said she would ask Miss McDonough if she still needed
15 it.  And I never heard back from them.  And then I found out
16 from Mr. Gabel that Miss McDonough called Bob Bondi and said
17 I wasn't cooperating.
18    Q.  So, that's one time where she had complained to
19 somebody; right?
20    A.  Uh-huh.
21    Q.  About you; is that right?  You need to say "yes"
22 or "no."  You just said, "Uh-huh."
23    A.  Yes.
24    Q.  So, the managing directors happened to be in
25 Chicago when the World Trade Center thing happened?

Page 223

1     A.  Yes.
2     Q.  Wow, that's amazing.  So, that would include
3  Gabel?
4     A.  Yes.
5     Q.  Who else -- who else would that include?
6     A.  In Chicago?
7     Q.  Yeah.
8     A.  I don't know who else.
9     Q.  That would have included Miss McDonough?
10    A.  I believe it did and Jerry Bland.  Other than
11 that, I don't know who else.
12    Q.  This is under March 2002.  The third -- third
13 paragraph down says "Bob Bondi asks Vickie McDonough to find
14 a spot for me in the Houston service center, encourages her
15 to place me as a Director of CAS.  Vickie states that she
16 'doesn't know me' but will have to see."  So, how do you
17 know that Bob Bondi did that?
18    A.  Because there was a meeting.
19    Q.  I'm sorry.  There was a what?
20    A.  There was a meeting -- Miss McDonough, Mr. Bondi,
21 and I.
22    Q.  Oh, later -- later on, the next line, "Bob Bondi
23 meets with Vickie McDonough and me, states that I will now
24 report to Vickie and the" --
25    A.  Yes.

Page 224

1     Q.  -- "CSBU" --
2     A.  Yes.
3     Q.  -- "needs good young managers"?
4     A.  Yes.
5     Q.  Not making an age claim, are you?  Are you?
6     A.  I'm sorry?
7     Q.  Not making an age claim, are you?
8     A.  No.
9     Q.  Under April/May, the third line down says "Vickie
10 discusses with Sharon and I terminating John Canter."
11    A.  Uh-huh.
12    Q.  What -- tell me about that discussion.
13    A.  All she said was that she was going to terminate
14 him.
15    Q.  Oh, you were not involved in the decision?  She
16 was just letting you know that was going to happen?
17    A.  Yes, I was not involved in the decision.
18    Q.  The next sentence says she does terminate him, but
19 then he gets another job; right?
20    A.  Yes.
21    Q.  Next -- the next paragraph says "Amy Phillips,
22 Specialist in CAS, resigns.  Vickie makes her a Sr.
23 Specialist and she stays with the company."  Is that the
24 same person that we looked at that -- that was demoted, you
25 said?

Page 225

1     A.  No.
2     Q.  That's something different?
3     A.  Yes.
4     Q.  So, apparently Vicki demoted Amy Phillips?
5     A.  No.
6     Q.  She resigned but kept her on as a senior
7  specialist?
8     A.  I don't know.
9     Q.  Okay.  The next line, June 5th, it says "I become
10 the Director of CAS."
11    A.  Yes.
12    Q.  "Data Management is now fully merged with CAS."
13    A.  Yes.
14    Q.  You talked about being the director of technical
15 operations.  Then you had special assignments.  And then you
16 went to the director of PSU.
17    A.  Yes.
18    Q.  What is CAS?
19    A.  Client account services.
20    Q.  Was that a full-blown job or just sort of a
21 transition thing or what was that?
22    A.  No.  That was the head of a unit.
23    Q.  Is there some reason you didn't mention that
24 before?
25    A.  I did mention it.

57 (Pages 222 to 225)

Page 234

1    Q.   That's Vicki's boss; right?
2    A.   Yes.
3    Q.   "He states that if the field loses confidence then
4    he must make a change, just like he did with Joe and Karen."
5    Was that confidence in you?  Who's he -- who's he saying
6    loses confidence?
7    A.   It's a general statement that he made.
8    Q.   You're calling him about, what, looking for
9    another position within --
10   A.   Job advice.  I was invited to call him.
11   Q.   Okay.  Then it says the next day you called John
12   Gabel, and he offered you an AD position in New York.
13   A.   Yes.
14   Q.   Did you think about taking it?
15   A.   I had just had a baby.  My wife and I had just had
16   a baby.  I didn't -- I did consider it.  However --
17   Q.   But you decided to stay anyway?
18   A.   Yes.
19   Q.   He says that you would have to take a pay cut even
20   if you stayed in Houston.
21   A.   Yes.
22   Q.   But that didn't actually happen, did it?
23   A.   No.
24   Q.   We've talked about the 10-13 meeting there at the
25   bottom of that page; right?

Page 235

1    A.   Yes.
2    Q.   Look at the 10-29.  There's a little more detail
3    here than I think we discussed when we discussed that
4    earlier.  "Donna called and asked to speak with me.  I met
5    with her in her office where she discussed the fact that she
6    felt the three Assistant Directors workload was not evenly
7    distributed."  That's a little different than what we talked
8    about before, isn't it?  I mean, the fact -- it sounds like
9    you weren't doing as much work as the other two people.
10   A.   That's not a correct statement.
11   Q.   Well, I guess there's two ways to look at that.
12   One, did she say that?  And, two, whether it's true or not
13   is another situation.
14   A.   She asked me what my work activities were during
15   the day.
16   Q.   Okay.  Well, this is something you wrote; right?
17   A.   Right.
18   Q.   So, she must have said that the workload was not
19   evenly distributed; right?
20   A.   Okay.  Right, yes.
21   Q.   And then she asked you about your work activity?
22   A.   Yes.
23   Q.   Then it says "Donna stated I couldn't have the
24   Dallas team because it took Tracie a long time to develop a
25   relationship with them."  Did we talk about that?

Page 236

1    A.   Yes.
2    Q.   And then we talked about the Florida team?
3    A.   Yes.
4    Q.   We have talked about the rest of that; right?
5    A.   Yes.
6    Q.   It looks like the -- on the 4th Vicki raises this
7    thing with the three AD work not being even too; right?
8    A.   That's what I've written, yes.
9    Q.   So, that must have happened, then, right, because
10   you wrote it down?
11   A.   Yes.
12   Q.   And you were doing it at the time all this was
13   going on; right?
14   A.   Yes.
15   Q.   You said "They want someone who had been an
16   Account Manager before and they were terminating me since I
17   have not had that experience in the past."  That was -- she
18   said that in the meeting?
19   A.   Verbatim, yes.
20   Q.   Now, who is an account manager?  Was the person
21   that replaced you an account manager?
22   A.   I don't know.
23   Q.   She told you she -- you could look for another
24   business -- another position in the business unit; right?
25   A.   Yes.

Page 237

1    Q.   She said she would be happy to write you a
2    reference.  "She stands up extends her hand.  I state that
3    I'm not going to shake her hand."
4    A.   Yes.
5    Q.   Is that true?
6    A.   Yes.
7    Q:   Why didn't you want to shake her hand?
8    A.   It wasn't appropriate.
9    Q.   Why not?
10   A.   Because it wasn't.
11   Q.   You just didn't feel like doing it?
12   A.   No.
13   Q.   "Ernie Joyner remains behind with me and discusses
14   there is no severance as they are going to replace the
15   position."  Did you ask him anything about that?
16   A.   No.
17   Q.   On the 4th of December, "Sharon Patin leaves a
18   voice mail on my cell phone asking me to call her if I am
19   interested in completing the Special Project.  I did not
20   return her phone call."  So, it sounds like you didn't
21   complete the special project.
22   A.   No, I did complete the special project.  But I was
23   invited to come back as a temporary employee working for --
24   through a temporary agency.
25   Q.   It doesn't say that, though, does it?

Page 238

1   A.  Well, like I said, it's just my notes.
2   Q.  So, she did call -- she must have called and asked
3   you to complete the project, and you did not even return her
4   call; right?
5   A.  My employment was ended on December the 2nd. My
6   employment with Aon ended December the 2nd.
7   Q.  Why would she ask you to -- this is something you
8   wrote down.
9   A.  Right. She called me and said I could come back
10  if I wanted to work through Manpower Temporary Services as a
11  temp employee working for Manpower but placed at Aon.
12  Q.  Working on this special project that you had
13  already completed?
14  A.  It's an ongoing project. There are multiple
15  people doing the project.
16  Q.  So, it wasn't completed?
17  A.  No.
18  Q.  It was still going on?
19  A.  Right.
20  Q.  Is there any reason you didn't put down the --
21  this stuff about the temporary and the Manpower stuff?
22  A.  No.
23  Q.  Have you talked to anybody else about this case
24  other than those people you mentioned when we first started
25  talking today?

Page 239

1   A.  No.
2   Q.  Besides what we have talked about here today, did
3   the company do anything else adversely to you?
4   A.  Please repeat the question.
5   Q.  Did the company -- did somebody take you in the
6   back hall and beat you up, did anything else adverse to you
7   other than what we have talked about here today?  I don't
8   want you coming in at trial and saying, "They inflicted
9   emotional distress on me," or, "They assaulted me," or
10  something like that.
11  A.  No assault.
12      MR. FIDDLER:  Objection, form.
13  Q.  (BY MR. NOTESTINE)  Intentionally inflicted
14  emotional distress.  Sorry.
15      Have you ever filed a charge against any other
16  employer?
17  A.  No.
18  Q.  Have you ever been involved in any other lawsuit
19  either as a defendant or a plaintiff?
20  A.  No.
21  Q.  Have you ever made claims against other employers,
22  such as unemployment compensation or anything like that?
23  A.  No.
24  Q.  Have you ever filed for bankruptcy?
25  A.  No.

Page 240

1   Q.  Any facts that support your claims against Aon
2   that we have not already discussed today?
3   A.  No.
4       MR. FIDDLER:  Objection, form.
5       MR. NOTESTINE:  I pass the witness.
6           EXAMINATION
7   BY MR. FIDDLER:
8   Q.  Were you married -- have you been married the
9   entire time since your termination from Aon?
10  A.  Yes.
11  Q.  So, would your wife have been able to observe some
12  of the mental anguish that you've suffered and how it's
13  affected you?
14      MR. NOTESTINE:  Objection, leading.
15  Q.  (BY MR. FIDDLER) Can you tell us whether or not
16  your wife has observed any of the mental anguish and other
17  ways in which your termination has adversely affected you?
18  A.  Yes.
19      MR. NOTESTINE:  Objection, leading.
20      MR. FIDDLER:  I pass the witness.
21      Is there anything else?
22      MR. NOTESTINE:  No.  That's it.
23      MR. FIDDLER:  Okay.
24      THE VIDEOGRAPHER:  Going off the record.
25  The time is 5:00 o'clock p.m.

Page 241

1           CHANGES AND SIGNATURE
2   WITNESS NAME: MARK A. HANSEN        DATE: MAY 10, 2006
3   PAGE LINE      CHANGE           REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20      I, MARK A. HANSEN, have read the foregoing deposition
21  and hereby affix my signature that same is true and correct,
22  except as noted above.
23
24      _____
25          MARK A. HANSEN

61 (Pages 238 to 241)